The Honorable Tana Lin

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

AUSTIN HITCH, DIANA GARCIA-MOZQUEDA, MARK SIMONEAU, and HENRY SOK individually and on behalf of all others similarly situated,

Plaintiffs,

v.

CELLCO PARTNERSHIP, a foreign general partnership doing business as VERIZON WIRELESS; SEATTLE SMSA LIMITED PARTNERSHIP, a foreign limited partnership doing business as VERIZON WIRELESS; VERIZON COMMUNICATIONS INC., a foreign profit corporation; and DOES 1-20, as yet unknown Washington entities,

Defendants.

No. 2:25-cv-01469-TL

**DECLARATION OF TIMOTHY W. EMERY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, Timothy W. Emery, certify and declare under the penalty of perjury of the laws of the United States and the state of Washington that the following is true and correct and based upon personal knowledge to the best of my ability:

1. I am over the age of 18 and competent to testify to the matters herein.

2. I am an attorney of record for Plaintiffs Austin Hitch, Diana Garcia-Mozqueda, and Mark Simoneau ("Plaintiffs") in the above-captioned putative class action against Defendants Cellco Partnership; Seattle SMSA Limited Partnership; Verizon Communications Inc. (collectively, "Defendants").

DECLARATION OF TIMOTHY W. EMERY - 1

No. 2:25-cv-01469-TL

## Counsel Qualifications

3. I have been licensed to practice law in the state of Washington since 2003 and in the state of Utah since 2009.

4. I am admitted to both the state and federal courts of Washington.

5. I have extensive experience litigating and managing the litigation of employment and consumer actions, including class actions, in the state and federal courts of Washington, Utah, and California.

6. I am a founding member of Emery | Reddy, PC.

7. Emery | Reddy is comprised of successful and experienced attorneys with substantial experience handling class actions (particularly involving workers' rights in Washington) and complex litigation. My firm is committed to devoting the necessary time and resources to prosecuting this case on behalf of Plaintiffs and the proposed class.

8. Emery | Reddy was formed in 2005 and is a leading boutique litigation firm in Washington focused on protecting workers' rights. Emery | Reddy has successfully obtained hundreds of millions of dollars on behalf of thousands of clients. The firm has amassed numerous awards and recognition for its skilled representation of Washington workers and consumers.

9. I have unique experience representing both plaintiffs and defendants in high stakes litigation.

10. Prior to serving Washington workers, I was regulatory and litigation defense counsel for nationwide companies, including GMAC Mortgage Corp, Credit.com, and Creditrepair.com. I spent nearly a decade as General Counsel to H.I.G. Capital, LLC portfolio entities, and was responsible for managing litigation in the consumer and credit space, including lawsuits filed for alleged violations of the CROA, TCPA, TSR, and various state CPAs. In this role, I successfully resolved dozens of national class action matters, including Ducharme v. John C. Heath Attorney at Law, PLLC, No. 3:10-cv-02763 (N.D. Cal.), which reinterpreted the Credit

DECLARATION OF TIMOTHY W. EMERY - 2

No. 2:25-cv-01469-TL

**EMERY | REDDY, PC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Phone: (206) 442-9106 • Fax: (206) 441-9711

Repair Organizations Act, 15 U.S.C. §§ 1679-1679j, permitting credit repair organizations to engage in periodic billing procedures.

11.    My experiences defending class actions gives me a unique perspective on defense motivations and considerations that enable me to better anticipate and respond to defense strategy that in turn allows me to better serve the interests of the consumer and worker classes I now represent.

12.    My practice now primarily focuses on representing workers and consumers. I have litigated and managed the litigation of hundreds of employment law matters.

13.    For example, I was co-lead counsel in *Frisino v. Seattle School District No. 1*, 160 Wn. App. 765 (2011), *cert. denied*, 172 Wn.2d 1013 (2011), a landmark Washington disability discrimination case, which interpreted the state's disability accommodation laws in favor of Washington workers.

14.    My firm and I have a proven track record of successfully litigating in new and developing areas of law and obtaining successful results for workers and consumers. For example, my firm led the efforts in obtaining a successful ruling from the Washington Supreme Court in *Branson v. Washington Fine Wine & Spirits, LLC*, 5 Wn.3d 289, 574 P.3d 1031 (2025), which broadly interprets the EPOA's definition of "applicant" in favor of workers. Likewise, we were co-counsel in *Nunley v. Chelan-Douglas Health District*, 32 Wn. App. 2d 700, 558 P.3d 513 (2024), where the Court held that data breach victims could pursue negligence claims against Washington entities, resolving a long-standing dispute about the viability of that claim in Washington.

15.    Additionally, my firm and I have significant experience litigating unlawful non-competition agreement claims. Notably, I was co-lead counsel in *David v. Freedom Vans*, 4 Wn.3d 242, 562 P.3d 351 (2025), a landmark Washington Supreme Court case that interpreted the state's laws restricting the use of non-competition agreements in favor of Washington workers by narrowly construing the statutory exceptions to the prohibitions on non-competition agreements set forth in RCW 49.62.070.

DECLARATION OF TIMOTHY W. EMERY - 3

No. 2:25-cv-01469-TL

**EMERY | REDDY, PC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Phone: (206) 442-9106 • Fax: (206) 441-9711

16.     My firm is likewise responsible for several recent class resolutions in connection with consumers' and workers' rights, such as minimum wage and overtime payment violations, violations of the laws regarding meals and breaks, violations of the Washington Equal Pay Opportunities Act, violations of the secure scheduling ordinance, and data breaches. Some representative matters include:

- *Abrego Olea v. Vessel WA Operations, LLC*, No. 22-2-06944-9 (King Cnty. Super. Ct.) (secured payments to the class for non-compete violations);

- *Atkinson v. AMF Bowling Centers, Inc.*, No. 23-2-19816-6 (King Cnty. Super. Ct.) (secured payments to the class for EPOA violations);

- *Atkinson v. Burberry Ltd.*, No. 23-2-19460-8 (King Cnty. Super. Ct.) (secured payments to the class for EPOA violations);

- *Brinkman v. Emanuel, Inc.*, No. 24-2-02186-8 (King Cnty. Super. Ct.) (secured payments to the class for missed meals and breaks and minimum wage violations);

- *Carlson v. Pacific Northwest Fondue LLC*, No. 19-2-05401-8 (King Cnty. Super. Ct.) (secured payments to the class for missed meals and breaks);

- *Clopp v. Pacific Market Research LLC*, No. 21-2-08738-4 (King Cnty. Super. Ct.) (secured payments to the class in a data breach action);

- *Cole v. Verity Credit Union*, Nos. 24-2-26830-8 SEA and 24-2-18460-1 SEA (King Cnty. Super. Ct.) (secured payments to the class for missed meals and breaks and non-compete violations);

- *Cottington v. Washington Traffic Control., LLC*, No. 22-2-02152-7 (King Cnty. Super. Ct.) (secured payments to the class for minimum wage violations);

- *Davis v. Jeff, Pat, Chris LLC*, No. 19-2-33832-6 (King Cnty. Super. Ct.) (secured payments to the class for minimum wage violations);

- *Dozier v. Noble Food Group, Inc.*, No. 19-2-01148-29 (Skagit Cnty. Super. Ct.) (secured payments to the class for minimum wage violations);

- *Dykstra v. The Shield Co Management, LLC, DBA Ecoshield Management Co, LLC*, No. 23-2-24015-4 KNT (King Cnty. Super. Ct.) (secured payments to the class for missed meals and breaks, and for unpaid drive time);

- *Evans v. Jacobs Solutions Inc.*, No. 24-2-14584-2 SEA (King Cnty. Super. Ct.) (secured payments to the class for unpaid PTO);

DECLARATION OF TIMOTHY W. EMERY - 4

No. 2:25-cv-01469-TL

**EMERY | REDDY, PC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Phone: (206) 442-9106 • Fax: (206) 441-9711

- *Floyd v. DoorDash, Inc.*, No. 23-2-19559-1 (King Cnty. Super. Ct.) (secured payments to the class for EPOA violations);

- *Garcia v. WA Department of Licensing*, No. 22-2-05635-5 SEA (King Cnty. Super. Ct.) (secured payments to class in a data breach action);

- *Garner v. Amazon Retail LLC*, No. 24-2-11344-0 (Pierce Cnty. Super. Ct.) (preliminarily approved payments to the class for missed meals and breaks);

- *Gegax v. Ann / Judith In Home Caregivers of Western WA, LLC*, No. 22-2-17728-4 (King Cnty. Super. Ct.) (secured payments to the class for non-compete violations);

- *Grove v. Cressy Door Company, Inc.*, No. 21-2-09828-9 (King Cnty. Super. Ct.) (secured payments to the class for missed meals and breaks and travel time);

- *Heard v. Home Express Delivery Service, LLC*, No. 20-2-07098-0 (King Cnty. Super. Ct.) (secured payments to the class for missed overtime wages);

- *Honc v. Pacific Pie, Inc.*, No. 21-2-02653-32 (Spokane Cnty. Super. Ct.) (secured payments to the class for minimum wage violations);

- *Jones v. eFinancial, LLC*, No. 22-2-19385-9 (King Cnty. Super. Ct.) (secured payments to the class for non-compete violations);

- *Justice v. Lube Development, L.C.*, No. 23-2-12593-2 SEA (King Cnty. Super. Ct.) (secured payments to the class for missed meals and breaks);

- *Kennedy v. Ginsing, LLC*, No. 20-2-05287-6 (King Cnty. Super. Ct.) (secured payments to the class for missed meals and breaks);

- *LaCombe v. USNR, LLC*, No. 23-2-03036-2 (King Cnty. Super. Ct.) (secured payments to the class for time-clock rounding violations);

- *Lazova-Fast v. Big Al's, Inc.*, Nos. 24-2-03907-06 and 24-2-03908-06 (Clark Cnty. Super. Ct.) (secured payments to the class for missed meals and breaks, and for unpaid service charges);

- *Moliga v. Qdoba Restaurant Corporation*, No. 23-2-11540-6 (King Cnty. Super. Ct.) (secured payments to the class for EPOA violations);

- *Morey v. Aftermath Services, LLC*, No. 2:21-cv-00885 (W.D. Wash.) (secured payments to the class for missed meals and breaks and minimum wage violations);

DECLARATION OF TIMOTHY W. EMERY - 5

No. 2:25-cv-01469-TL

**EMERY | REDDY, PC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Phone: (206) 442-9106 • Fax: (206) 441-9711

- *Morrow v. Maverick Washington, LLC*, No. 22-2-03653-2 (King Cnty. Super. Ct.) (secured payments to the class for missed meals and breaks and minimum wage violations);

- *Nyannor v. Vessel WA Operations, LLC*, No. 22-2-08233-0 (King Cnty. Super. Ct.) (secured payments to the class for violations of the Seattle Secure Scheduling Ordinance);

- *Shipman v. Airport Investment Company, Inc.*, No. 19-2-32386-8 (King Cnty. Super. Ct.) (secured payments to the class for minimum wage violations);

- *Spencer v. Mastercard International Incorporated*, No. 23-2-19564-7 (King Cnty. Super. Ct.) (secured payments to the class for EPOA violations);

- *Swafford v. Vera Whole Health WA, PC*, No. 24-2-21688-0 SEA (King Cnty. Super. Ct.) (secured payments to the class for missed meals and breaks);

- *Viveros v. Perfect Blend, LLC*, No. 23-2-05511-0 (King Cnty. Super. Ct.) (secured payments to two classes for EPOA and MWA violations);

- *Voivod v. Apizza, LLC*, No. 23-2-06729-1 SEA (King Cnty. Super. Ct.) (secured payments to the class for missed meals and breaks);

- *Warren v. Discount Tire, Co. of Washington Inc.*, No. 22-2-10618-8 (Pierce Cnty. Super. Ct.) (secured payments to the class for missed meals and breaks and minimum wage violations);

- *Weidkamp v. Nature's Path Foods USA Inc.*, No. 25-2-10112-6 SEA (King Cnty. Super. Ct) (preliminarily approved payments to the class for missed meals and breaks);

- *Yount v. Diamond Parking, Inc.*, No. 23-2-19309-1 (King Cnty. Super. Ct.) (secured payments to the class for EPOA violations); and

- *Yount v. Northwest Restaurants, Inc.*, No. 23-2-19399-7 (King Cnty. Super. Ct.) (secured payments to the class for EPOA violations).

17.     In addition to *Freedom Vans*, I have served as lead counsel in nine class actions involving claims for violations of Washington's noncompete law, chapter 49.62 RCW, including five settlements that received final approval and resulted in an excellent recovery for the respective classes and two orders granting contested class certification:

- *Abrego Olea v. Vessel WA Operations, LLC*, No. 22-2-06944-9 (King Cnty. Super. Ct.) (obtaining final approval of class settlement which included payments

DECLARATION OF TIMOTHY W. EMERY - 6

No. 2:25-cv-01469-TL

**EMERY | REDDY, PC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Phone: (206) 442-9106 • Fax: (206) 441-9711

to the class for non-compete violations and appointment of Emery | Reddy as class counsel);

- *Gegax v. Ann / Judith In Home Caregivers of Western Washington, LLC*, No. 22-2-17728-4 (King Cnty. Super. Ct.) (obtaining final approval of class settlement which included payments to the class for non-compete violations and appointment of Emery | Reddy as class counsel);

- *Jones v. eFinancial, LLC*, No. 22-2-19385-9 (King Cnty. Super. Ct.) (obtaining final approval of class settlement which included payments to the class for non-compete violations and appointment of Emery | Reddy as class counsel);

- *Saraceno-Oliveri v. Solgen Power*, *LLC*, No. 23-2-09228-7 (King Cnty. Super. Ct.) (obtaining final approval of class settlement which included payments to the class for non-compete violations and appointment of Emery | Reddy as class counsel);

- *Schneider v. Assurance IQ, LLC*, No. 22-2-15633-3 (King Cnty. Super. Ct.) (obtaining final approval of class settlement which included payments to the class for non-compete violations and appointment of Emery | Reddy as class counsel);

- *Burns v. Amazon.com Services LLC*, No. 24-2-22574-9 SEA (King Cnty. Super. Ct. Sept 4, 2025) (obtained contested class certification, including appointment of Emery | Reddy as class counsel);

- *Grays v. Costco Wholesale Corp.*, No. 25-2-17717-3 SEA (King Cnty. Super. Ct. Dec. 12, 2025) (obtained contested class certification, including appointment of Emery | Reddy as class counsel);

- *Cole v. Verity Credit Union*, No. 24-2-18460-1 SEA (King Cnty. Super. Ct. Jan. 9, 2026) (obtained final approval of class settlement which included payments to the class for non-compete violations and appointment of Emery | Reddy as class counsel); and

- *Jens v. Tori Belle Cosmetics*, No. 22-2-06641-5 SEA (King Cnty. Super. Ct. Jan. 3, 2023) (obtained contested class certification and summary judgment of a non-compete class including a $10 million judgment as well as appointment of Emery | Reddy as class counsel).

18.    In the context of litigating these non-competition cases (and others), Emery | Reddy and I have analyzed the key legal and common factual issues that arise in these cases and is prepared to address them efficiently and effectively. We are also well prepared to expeditiously address any new issues that may come up in this matter to provide meaningful guidance to the Court to resolve disputed questions. Emery | Reddy regularly tracks ongoing Washington

DECLARATION OF TIMOTHY W. EMERY - 7

No. 2:25-cv-01469-TL

**EMERY | REDDY, PC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Phone: (206) 442-9106 • Fax: (206) 441-9711

employment litigation as well as regulatory and legislative actions in this area, including non-competition law.

19.     Emery | Reddy has sufficient resources to prosecute this action on behalf of Plaintiffs and the putative class through its conclusion, including to trial if necessary. My firm's resources are not merely financial but our roster of experienced attorneys and support staff.

20.     Patrick Reddy, my partner and co-founder of Emery | Reddy, is a seasoned worker's rights litigator. He has practiced employment law in Washington state for over twenty years, dedicating his career to advancing the rights of Washington workers in countless actions before Washington's Board of Industrial Insurance Appeals, superior courts, and appellate courts, including the Washington Supreme Court. Mr. Reddy served as co-lead counsel in *Frisino*. Further, Mr. Reddy was instrumental in securing class certification in the non-compete cases, *Burns v. Amazon* and *Gray v. Costco*, successfully arguing both motions.

21.     Assisting us on this case are several associates, including Mr. Paul Cipriani and Ms. Hannah Hamley, each of whom have experience litigating RCW 49.62.070 violations, and other chapter 49.62. RCW claims, including as counsel on the above-referenced matters.

22.     Paul Cipriani graduated from Seattle University School of Law in 2022. He joined Emery | Reddy in 2018 as part of the firm's intake team and has since become a driving force in the firm's employment and class action practice, with significant experience representing classes and groups of workers in both state and federal courts. Mr. Cipriani brings substantial litigation and appellate experience to complex, class-wide matters. He has served in leadership roles on behalf of putative classes, including securing class payments and appellate victories that have materially benefited Washington workers, and his work on behalf of classes of employees has been repeatedly recognized through inclusion on *The National Trial Lawyers* "Top 40 Under 40" list. Mr. Cipriani's demonstrated ability to lead in class action litigation, along with his strong courtroom presence and commitment to systemic remedies for employment violations, make him a valued member of the litigation team and a compelling addition to the leadership slate.

DECLARATION OF TIMOTHY W. EMERY - 8

No. 2:25-cv-01469-TL

**EMERY | REDDY, PC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Phone: (206) 442-9106 • Fax: (206) 441-9711

23.     Hannah Hamley graduated with honors from Seattle University School of Law in May 2021. She thereafter served for three years as a judicial law clerk to Associate Chief Justice Charles W. Johnson of the Washington Supreme Court, where she honed her skills in appellate analysis and complex legal reasoning. Since joining Emery | Reddy in September 2024, Ms. Hamley has played a lead role in the firm's employment, class action, and appellate litigation practice, focusing on high-stakes motions and novel legal issues. She brings particular strength in legal research and writing, including the development of novel legal arguments in emerging areas of law such as pay transparency and noncompetition restrictions. Ms. Hamley was instrumental in crafting the arguments that led to a favorable ruling in *Branson v. Washington Fine Wine & Spirits, LLC*, 5 Wn.3d 289, 574 P.3d 1031 (2025). Her appellate-level experience, attention to detail, and ability to advance developing legal theories make her a valuable contributor to the prosecution of this action and to the broader litigation team. Ms. Hamley also serves on the Washington Employment Lawyers' Association's Amicus Committee and provides pro bono representation with the Northwest Immigrant Rights Project.

24.     I am confident that my firm will work efficiently and effectively on behalf of Plaintiffs and the putative class.

### Investigation and Discovery

25.     Prior to filing this putative class action my firm and I thoroughly researched and evaluated the merits of Plaintiffs' claims.

26.     We reviewed Plaintiff Austin Hitch's employment documents, including pay records and Verizon's employment policies.

27.     Before amending the complaint, we reviewed Plaintiffs Diana Garcia-Mozqueda and Mark Simoneau's employment documents.

28.     We have engaged in formal discovery.

29.     We investigated Defendants and evaluated their potential defenses and whether the case should be brought as a class action.

DECLARATION OF TIMOTHY W. EMERY - 9

No. 2:25-cv-01469-TL

**EMERY | REDDY, PC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Phone: (206) 442-9106 • Fax: (206) 441-9711

30.     We have devoted significant time and resources to this putative class action and are committed to devoting whatever time and resources are necessary to continue prosecuting this action on behalf of Plaintiffs and the putative class.

## Plaintiffs as Class Representatives

31.     Plaintiff Austin Hitch has been committed to this action from the beginning and continues to make significant contributions to advance the prosecution and resolution of the litigation.

32.     He assisted counsel in investigating the claims, gathering evidence, preparing the complaint, preparing the amended complaint, conducting discovery, and understanding the facts.

33.     Plaintiffs Diana Garcia-Mozqueda and Mark Simoneau are also committed to this action and continue to make significant contributions to advance the prosecution and resolution of the litigation.

34.     They assisted counsel in investigating the claims, gathering evidence, preparing the amended complaint, conducting discovery, and understanding the facts.

35.     Plaintiffs Hitch, Garcia-Mozqueda, and Simoneau have provided evidence to support their claims, participated in several meetings with counsel, stayed in contact with the firm, are preparing to testify via deposition, and will prepare to testify at trial if necessary.

36.     At Defendants' request, all three Plaintiffs are scheduled to sit for depositions on or before July 15, 2026.

## Exhibits

37.     **Exhibit A:** True and correct excerpts from the 30(b)(6) Deposition Transcript of Defendants' corporate representative, Senior Director of Verizon Ethics and Associate General Counsel, Glen Spoviero, taken on May 20, 2026.

38.     **Exhibit B:** True and correct excerpts from Defendants' Code of Conduct, published in 2021 and produced during discovery and identified by Defendants' bates numbers Cellco_Hitch002353 to Cellco_Hitch002368.

DECLARATION OF TIMOTHY W. EMERY - 10

No. 2:25-cv-01469-TL

**EMERY | REDDY, PC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Phone: (206) 442-9106 • Fax: (206) 441-9711

39.      **Exhibit C**: True and correct excerpts of Defendants' Code of Conduct, published in April 2023, produced by Defendants during discovery and identified by Defendants' bates numbers Cellco_Hitch000048 to Cellco_Hitch000063.

40.      **Exhibit D**: True and correct excerpts of Defendants' Code of Conduct, published in July 2023, produced by Defendants during discovery and identified by Defendants' bates numbers Cellco_Hitch002282 to Cellco_Hitch002297.

41.      **Exhibit E**: True and correct excerpts of Defendants' Code of Conduct, published in October 2023, produced by Defendants during discovery and identified by Defendants' bates numbers Cellco_Hitch002315 to Cellco_Hitch002330.

42.      **Exhibit F**: True and correct excerpts of Defendants' Code of Conduct, published in November 2024, produced by Defendants during discovery and identified by Defendants' bates numbers Cellco_Hitch000002 to Cellco_Hitch000017.

43.      **Exhibit G:** True and correct excerpts of Defendants' Standards of Conduct policy, produced by Defendants during discovery and identified by Defendants' bates numbers Cellco_Hitch002350 to Cellco_Hitch002352.

44.      **Exhibit H:** True and correct excerpts of Defendants' Code of Conduct: Integrity Always Matters – Training, produced by Defendants during discovery and identified by Defendants' bates numbers Cellco_Hitch002511 to Cellco_Hitch002516.

45.      **Exhibit I**: True and correct excerpts from Defendants' Code of Conduct: Integrity Always Matters – Training, produced by Defendants during discovery and identified by Defendants' bates numbers Cellco_Hitch002918 to Cellco_Hitch002919.

46.      **Exhibit J**: True and correct excerpts of Defendants' Code of Conduct 2021 - Integrity Always Matter – Training, produced by Defendants during discovery and identified by Defendants' bates numbers Cellco_Hitch003109 to Cellco_Hitch003110.

47.      **Exhibit K**: True and correct excerpts of Defendants' Code of Conduct 2021: Integrity Always Matter – Training, produced by Defendants during discovery and identified by Defendants' bates numbers Cellco_Hitch003249 to Cellco_Hitch003250.

DECLARATION OF TIMOTHY W. EMERY - 11

No. 2:25-cv-01469-TL

**EMERY | REDDY, PC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Phone: (206) 442-9106 • Fax: (206) 441-9711

48.    **Exhibit L**: True and correct excerpts of Defendants' Code of Conduct: Privacy, Information Security and More Training, produced by Defendants during discovery and identified by Defendants' bates numbers Cellco_Hitch003492 to Cellco_Hitch003495.

49.    **Exhibit M**: True and correct copies of acknowledgment pages for Verizon's trainings, produced by Defendants during discovery and identified by Defendants' bates numbers Cellco_Hitch003221 and Cellco_Hitch002602.

50.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this June 30 2026, in Seattle, Washington.


By:    _/s/ Timothy W. Emery_____
       Timothy W. Emery, WSBA No. 34078

DECLARATION OF TIMOTHY W. EMERY - 12

No. 2:25-cv-01469-TL

**EMERY | REDDY, PC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Phone: (206) 442-9106 • Fax: (206) 441-9711

# EXHIBIT A

Class Cert. 1

**RECEIVED**
By Emery Reddy, PC at 11:17 am, Jun 16, 2026

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

AUSTIN HITCH, DIANA GARCIA-MOZQUEDA, MARK SIMONEAU, and HENRY SOK, individually and on behalf of all others similarly situated, )
)
)
)
)
Plaintiffs, )
)
vs. )
)
CELLCO PARETNERSHIP, a foreign general partnership doing business as VERIZON WIRELESS; SEATTLE SMSA LIMITED PARTNERSHIP, a foreign limited partnership doing business as VERIZON WIRELESS; VERIZON COMMUNICATIONS INC., a foreign profit corporation; and DOES 1-20, as yet unknown Washington entities, )
)
)
)
)
)
)
)
)
)
)
Defendants. )

No. 2:25-cv-01469-TL

**ORIGINAL**

30(b)(6) VIDEOTAPED DEPOSITION OF CELLCO PARTNERSHIP

BY AND THROUGH GLEN SPROVIERO

May 20, 2026

Via Videoconference

REPORTED BY:  Valerie L. Torgerson, CCR, RPR
              License No. 2036

Class Cert. 2

```
              APPEARANCES - VIA VIDEOCONFERENCE

   For the Plaintiffs:

                   Paul Cipriani, Jr.
                   Emery Reddy
                   600 Stewart Street
                   Suite 1100
                   Seattle, WA 98101
                   206.442.9106
                   206.441.9711 Fax
                   paul@emeryreddy.com


   For the Defendants:

                   Kyle D. Nelson
                   Seyfarth Shaw
                   999 Third Avenue
                   Suite 4700
                   Seattle, WA 98104
                   206.946.4910
                   knelson@seyfarth.com


   Also present:

                   Michael Hehenkamp, Videographer
                   Sunny Mikesell
```

Class Cert. 3

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026                              Page 3

EXAMINATION INDEX

EXAMINATION BY:                                                PAGE NO.

Mr. Cipriani                                                        5


EXHIBIT INDEX

EXHIBIT NO.          DESCRIPTION                              PAGE NO.

Exhibit No. 1       7-page Notice of Deposition of              8
                    Cellco Partnership Pursuant to
                    Fed. R. Civ. P. 30(b)(6).

Exhibit No. 2       4-page Offer Letter to Austin              20
                    Hitch from Kathi Mael dated
                    10/3/2013.

Exhibit No. 3       33-page document titled                   29
                    "Integrity is at the core of
                    who we are.  Code of Conduct."
                    Cellco_Hitch002353 through
                    002385.

Exhibit No. 4       145-page Code of Conduct                   67
                    Privacy Information Security &
                    More training.
                    Cellco_Hitch003364 through
                    003508.

Exhibit No. 5       119-page Code of Conduct                   81
                    Integrity Always Matters
                    training.
                    Cellco_Hitch002485 through
                    002603.

Exhibit No. 6       29-page Code of Conduct-                   98
                    Integrity Always Matters
                    VZ155317 training.
                    Cellco_Hitch002899 through
                    002927.

Exhibit No. 7       2-page document regarding                 103
                    conduct violations.
                    Cellco_Hitch002350 and 002351.

Class Cert. 4

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026

Page 4

REMOTE; WEDNESDAY, MAY 20, 2026

9:59 A.M.

--O0O--

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:59 a.m. on May 20, 2026. This is Volume 1, Media Unit Number 1 of the video-recorded virtual deposition of Glen Sproviero in the matter of Austin Hitch versus Cellco, filed in the U.S. District Court Western District Court of Washington at Seattle.  Case number is 2:25-cv-01469-TL.

This deposition is held via Zoom.  The court reporter is Valerie Torgerson from B&A Litigation Services, and the videographer is Michael Hehenkamp also from B&A.

Will counsel and all present please note their appearances and affiliations for the record.

MR. CIPRIANI:  Paul Cipriani, counsel for the plaintiff.

MR. NELSON:  Kyle Nelson, counsel for Cellco Partnership and Seattle SMSA Limited Partnership.

THE WITNESS:  And Glen Sproviero, associate general counsel and senior director of ethics at Verizon.

THE VIDEOGRAPHER:  Thank you.

Class Cert. 5

Will the court reporter please swear in the witness.

GLEN SPROVIERO,    deponent herein, being first duly sworn on oath, was examined and testified as follows:

THE VIDEOGRAPHER:  Please proceed.

EXAMINATION

BY MR. CIPRIANI:

Q   Glen, good morning.  My name is Paul Cipriani.  As you just heard, I represent Austin Hitch in the case of Hitch versus Cellco Partnership and Seattle SMSA Limited Partnership and Verizon Communications, Inc., and that case is pending in the U.S. District Court for the Western District of Washington.  The case number is 2:25-cv-01469-TL.

    And I know you just did this.  Would you mind stating your name and just spelling it for the record?

A   Sure.  It's Glen, G-l-e-n, Sproviero, S-p-r-o-v-i-e-r-o.

Q   Okay.  Have you ever been deposed before, Glen?

A   I have.

Q   Was that on behalf of Cellco?

A   I don't know if it was on behalf of Cellco.  On behalf of some Verizon entity.

corporate representative.

You understand that distinction; right?

A    I do.

Q    All right.  And I'd imagine we're both going to be referring to Cellco Partnership a lot today.  Can we agree for purposes of this deposition when we say "Verizon" or "Cellco," we're referring to Cellco Partnership, the defendant in this case?

A    That's fine.  Yes.

Q    Cool.

Can you just generally describe what steps you took to prepare for this deposition?

A    I reviewed the amended complaint.  I reviewed the -- our response to interrogatories and document demands.  I reviewed our code of conduct and some other documents that were produced to you in discovery.

Q    Cool.

Did you talk to any --

A    And --

Q    Oh, I'm sorry.  Go ahead.

A    And obviously I spoke to counsel.

Q    Sure.

Did you talk to any coworkers to prepare for this?

A    I asked -- not -- not in the context of asking them in any way about litigation.  I had asked people or someone

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026                    Page 10

on my team to help me pull documents, but that's it.

Q    Okay.

A    Most of the documents were pulled myself though.

Q    Cool.

There are 23 topics, and I'm sure you're aware that your counsel provided some objections to, I think, most of these topics.

You're familiar with generally these topics and your counsel's objections to them?

A    Correct.  I am.

Q    Okay.  All right.  And can you tell me the name of your current employer?

A    Verizon.

Q    And then what city and state do you work for Verizon out of?

A    I work out of Basking Ridge, New Jersey.

Q    How long have you worked for Verizon?

A    Eight and a half years.

Q    What's your current job title?

A    I'm senior director of Verizon Ethics and associate general counsel.

Q    Okay.  How long have you had your current job title?

A    Six and a half years.

Q    What did you do before your current title?

A    I was compliance counsel for two years, so from when I

Class Cert. 8

started at Verizon in January of 2018 until I was named senior director in February of 2020.

Q    Have you been involved at all in drafting pleadings or, you know, case strategy for this case?

A    No.

Q    And what does a senior director of Verizon Ethics and associate general counsel for compliance do at Verizon?

A    I'm responsible for day-to-day operations of our global compliance organization, so we have multiple areas of responsibility.  We are the custodians of the code of conduct, so we're the principle, I'd say, editors of code of conduct as well as the interpreters of most sections. We are responsible for providing guidance to employees who reach out to us through one of our contact mechanisms -- so we offer multiple avenues for employees to reach out to us -- and we are also the whistleblower hotline for misconduct.  So we are responsible for intake for any type of allegations that employees might have.

We're basically one-stop shopping for ethics, integrity, compliance, or if you just don't know where to go.  That's how we -- we advertise ourselves as the Easy Button, so we want to make it so that when employees have a question they can come to us.

We also provide support in the internal investigation space.  For many years Verizon Ethics was

Class Cert. 9

part of the internal -- had some internal investigation under it, so we do have an internal investigations component to our work, but we do have a stand-up parallel investigations team that has over the past year taken most of that work.

So we are the proactive guiding employees.  If you think of it as you have an HR business partner, we are your equivalent -- we are your legal ethics integrity partner.

Q   Okay.  Great.

And who do you report to?

A   I report to Steve Helvin, who is our vice president and deputy general counsel for investigations and ethics.

Q   Okay.  And who reports directly to you?

A   I have several people on my team.  I had -- John Baumeister is a senior manager.  Michelle Scott is a senior manager.  They are the two that report directly to me, and they both have folks reporting to them.

Q   And do you field complaints directly from, like, store-level employees, or do they go through your staff?

A   No, I'm hands on.  So anybody from front-line employees, you know, people who are installing FiOS in your house, selling phones in our stores, up to the CEO.  I deal with it all.

My staff does deal with -- you know, with -- we get

Class Cert. 10

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026                                    Page 13

many, many contacts a year, so the staff helps me do that. For every one of those though, the buck stops with me. I'm actively involved in conversations, discussions, especially if there's a thorny issue. If there's a gray area, that's when I'm brought into discussions immediately. So I have a lot of visibility into even the nuts and bolts of daily -- you know, daily inquiries, daily allegations.

Q  Okay. How does -- how does your department keep track of complaints from store-level employees?

A  Sure. So when someone reaches out to us, there is a couple different methods. You can call -- and I think this is consistent with most companies. You can call a hotline. We have a toll free hotline we operate, I think in 44 countries in multiple languages. That will come in a third-party vendor called Acuity. They have -- it's HR Acuity. That is our case management system. They have an offering called Speakfully, and Speakfully operates telephone lines, so it's third party, so that we can say that it's anonymous, and it is because a third party operates it. It also has a web portal which also allows for anonymous reporting. And then there is email to an Ethics@verizon.com email address. That's the global email address. These three options are given all over the world so that it's one funnel that people know they

Class Cert. 11

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026

Page 14

can reach out to, and then everything gets assigned a case number in the system.

So as soon as a matter comes in -- it comes through the phone or through the web portal -- the system automatically assigns a case number, which tracks routing, and then the -- anything that comes in through the email box, or a fourth option would be if somebody reaches out to me or somebody on my team directly, we would then also route it to the box and have it assigned a case number.  So anything that comes in -- I'm sorry. There's another way.  Slack, which is our internal, you know, chat bot -- or chat system, you can also reach out to us via chat.  Any of those ways will automatically result in the creation of a case ID.  That case ID -- basically I get a readout:  what's open, what's closed, the status of cases, so then everything is quality controlled.

I put my eyes on every single case that comes through.  I don't necessarily open the file, but I can see what type of case came through, where it came from, whether it's an allegation or an inquiry, how serious it is to know if I should be getting involved or just another quality control.  So it all goes through that single system which is then audited annually by E&Y.

Q   And you've been intimately involved with reviewing each

case as it comes through since, like, 2022?

A    So since 2020, since I've been in this role, I have been -- I don't want to say intimately involved in every case. That's not true. I'm intimately involved in the cases that I specifically handle myself, and I do, with my team, have a full caseload.

I'm intimately involved in any complicated issue. I'm intimately involved in anything that could be higher risk. I'm intimately involved in anything involving our senior executives or something that could just be new ground to cover, you know, a policy question.

When it comes to more routine matters, that's where I go through the spreadsheet, and I just look at it and make sure that nothing is standing out; there's no aberrations there. I've been dong this long enough where I could look at it and say, "Wait a second. I want to quality control something" or talk to my team or, you know, reach out to somebody and speak to them myself, but I'm not responsible for every case that comes through it.

Q    All right. Are cases categorized by state?

A    No.

Q    Is there a way to sort through them all to categorize them by state?

A    We could sort by state, but we don't treat -- I understand. I'm sorry. Let me restate that. I think I

Q    Okay.

A    HR Acuity is its formal name.

Q    And do employees at the store level have, like, an HR Acuity account?

A    No.  It's -- so HR Acuity is used by our team.  Very few people have access to it within the company.  It's our case management system.  So for employee privacy reasons, for a million reasons, that's where our -- it's our repository of internal investigations, people asking guidance on issues, so it's a fairly locked down system. My team, investigations, a handful of people in employee relations will have access to the files.

Q    Okay.  And I think when you were describing your job just generally, you kind of touched on, you know, you and your team's involvement in drafting and publishing the codes of conduct; right?

A    Yes.

Q    Okay.  How often are codes of conduct published?

A    Not often.  So, yeah, the last major rewrite of the code of conduct was 2019.  There have been small updates, largely small explanatory sidebars, maybe an update of the CEO's message.  Over the years maybe we've done, two, three, four.  One was just for branding, to change our colors, so you can see that there is maybe 20 -- October of '23 and, you know, February of '24, whatever the dates

Class Cert. 14

were, you can see slight changes, but generally speaking the last substantive change was 2019.

Q    Okay.    And were you involved in the 2019 change?

A    I was.

Q    Okay.  Did you guide --

A    It was before --

Q    Sorry.

A    I'm sorry.  It was before I was in my current job, but I had the same management, and it was me, my current supervisor, Steve Helvin, our joint supervisor, who is actually Compliance Officer David Kass, and another member of the team.

Q    Okay.  Do you guys canvas, like, state-specific laws and then provide addendums to the codes of conduct?

A    So we make the code of conduct broad.  It's -- we ensure compliance -- we ensure that we're not out of compliance with various state or international regulations.  You know, we operate in 50 states.  We operate in -- I think it's 44 countries.  Don't hold me exactly to that, but we operate in a lot of jurisdictions.

     So in order to make sure that we are covering what we need to cover and complying with all laws, we are broad.  We do have a provision in the code of conduct that -- that basically says, you know, you follow local law.  Local law trumps.  So if there's something

inconsistent here, it's local law that will prevail.

Q    And are you generally familiar with Verizon's, like, onboarding process?

A    I am from an ethics perspective, not the nuts-and-bolts HR perspective.

Q    Okay.  You may or may not know this.

Do you know who is in charge of Verizon's onboarding process, at least for Washington state?

A    I don't -- I would think, especially for the -- for sales employees, our talent acquisition team would be involved or would likely direct that process.

Q    Okay.  Do you have any idea who heads the talent acquisition team?

A    I'd have to think about that.  I don't off the top of my head.

Q    No worries.

Does Verizon have, like, an organizational chart?

A    Do we have -- do we have an actual org chart?  I've never seen one.  I know -- I don't know.

Q    Do you know if --

A    I've seen ad hoc charts, but do we have an official org chart?  I have no clue.

Q    No worries.

Do you know if Verizon utilizes the same code of conduct across, you know, the entire United States?  It

sounds like it does.

A    We do.

Q    Okay.

A    It's global.

Q    Does Verizon utilize the same, like, general onboarding policies across all of its locations?

A    I couldn't answer that.  I don't know.  From an ethics perspective, the answer is yes.  From an HR onboarding nuts-and-bolts perspective, I don't know.

Q    Okay.  And from the ethics perspective, does your team have any involvement in, I guess, formulating the offer letter templates that Verizon uses?

A    I'm sure at some point we've seen them, but I was not involved in drafting them.  I don't recall ever helping draft them.  I've seen them before, but I -- but I did not have a role in their creation.

Q    Okay.  Why don't we drop another exhibit into the chat here.

                    (Exhibit No. 2 marked for
                     identification.)

Q    (By Mr. Cipriani)  All right.  Can you see my share screen?

A    I can.

Q    Cool.

         All right.  So this document -- and I'll go through

Class Cert. 17

this slower.  I know you don't have access to the PDF -- it's Bates stamped Cellco_Hitch001351 through about 1354.

And I'll go through this just slowly.  Let me know if you want me to slow down.

A    If you can hold on for one sec.

Okay.  Okay.  All right.  Okay.

If you can go up for one sec, just a little bit.

Q    Yep.

A    Right there.  Stop.

Okay.  All right.  I got it.

Q    Cool.

Have you ever seen a document like this before?

A    I had not seen -- the answer is I'm sure I have.  I can't recall having seen one in any recent memory, no.

Q    Okay.  So I think this is --

A    This is -- and it's a 2013 document, so I wouldn't -- I don't even know if something like this would be the standard right now.

Q    Okay.  I guess that's a good point.

How would you go about determining whether Verizon, A, still uses these sort of, you know, onboarding letters, and, B, where would you find it?

A    I would need to ask HR.

Q    Okay.  So this is at least -- you correct me if I'm wrong.  It looks like an offer letter to the plaintiff in

this case, Austin Hitch.  You pointed out it's dated October 3, 2013.  I know it's kind of old.  He'd been working there for a while.

And I think you may have answered this already, but do you know if Verizon sends this sort of letter to all prospective employees after it makes, like, a verbal offer?

A    I'm sure that we send something in writing, yes.

Q    Okay.

A    We will send something.

Q    All right.  Just broad strokes, what's the purpose of sending these sorts of offer letters?

A    To --

            MR. NELSON:  Object to foundation.

            THE WITNESS:  I'm sorry?

            MR. NELSON:  Object to foundation.

    You can answer, Glen.

            THE WITNESS:  Thank you.

A    The purpose would be to spell out certain either terms or expectations and show what the areas of responsibility would be for a new employee.

Q    (By Mr. Cipriani)  I'm going to go down to the second page.  This is kind of the marked letter part, I suppose.

All right.  So the second paragraph, you see it says:  "Your anticipated start date is October 15, 2013.

B&A LITIGATION SERVICES

Class Cert. 19

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026                    Page 23

This is dependent upon the conditions outlined further in this document."

What's your understanding of what that means?

A  I think the plain language of that covers it.  As of that date there are conditions, and the conditions need to be followed to continue -- yeah.

Q  So you can't start working for Verizon until you follow everything in this letter; is that accurate?

MR. NELSON:  Object to the form.

A  Yes.

Q  (By Mr. Cipriani)  And two paragraphs down from that, there's a section titled "Code of Conduct."

A  I see that.

Q  Okay.  It says:  "Verizon requires all of its employees to comply with Our Code of Conduct as a condition of employment."

Is that your understanding, that Verizon continues to require all employees to comply with the code of conduct as a condition of employment?

A  The principles in the code of conduct are guidelines that we expect all of our employees to follow.  It's the foundation of our culture.  If you look at the code of conduct itself, it says, you know, this is -- this is the expected standards of behavior, you know:  We don't cheat; we don't lie; we're transparent; we are

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026                          Page 24

responsible with our -- with our customer's information.

So yeah, the expectations set out in the code of conduct are the expectations for how employees are supposed to behave and conduct themselves in all facets of their business.

Q   In the last sentence of this paragraph, it says:  "The online course will confirm your understanding of the code including conflicts of interest."

(Reporter clarification.)

Q   (By Mr. Cipriani)  All right.  So the last sentence of this Code of Conduction section, it says:  "The online course will confirm your understanding of the code including conflicts of interest."

Is there some standardized online course that all new hires have to go through?

A   There is, yes.  I believe it was produced to you.

Q   Was your team responsible for putting that together?

A   I was not here in 2013, but the more recent iterations of the code, my team is a central part of providing both subject matter expertise and writing the scenarios for the -- for the code of conduct.  I'm not -- the code of conduct training.  My team is not officially responsible for it -- it's the broader compliance organization -- but I'm -- me and my team are the principle sources of the scenarios and have been subjects that are treated

internally in it.

Q    Okay.

A    And I'm there for almost every step of development.

Q    Okay.  And we'll get to the code.  We'll go through it and that sort of thing, but it says, you know, "confirm your understanding of the code."

And the code has dozens and dozens of policies.  Why did Verizon choose to include the conflicts of interest policy in this broad statement?

A    I think conflicts of interest are one of -- and I think this is consistent across large corporations.  Conflicts of interest are one of the biggest risk areas for employees, both for Verizon and for the employees themselves.  So one of the things that we've always done as a company is try to encourage people to be sensitive to the idea of conflicts of interest, which is why it takes prominence in our code training, which is what explains the code of conduct, and all employees get it.

And code of -- conflicts of interest tend to be the issue that occurs with -- I don't want to say most frequency, but with a lot of frequency and often has a significant risk attached to it.

Q    Does your team get a lot of, I think you called them, reporters talking about conflicts of interest?

A    We do.

Q    Are you able to quantify that in the last three years?

A    A lot.  We -- we -- so we have -- as a team, we have over the past five years nearly quadrupled the amount of contacts coming to our team.  We have done significant outreach over the past half decade or a little more than half decade to encourage folks to reach out to us, to talk to us, to ask us questions.

One of the things that we do as an ethics organization is -- and this is -- this goes to what I said at the beginning -- is we're your partner.  We're the equivalent of your ethics business partner, and we are -- you know, our outreach has resulted in, you know, a very large number of -- volume of outreach.  Conflicts of interest outside of things like work environment, which is my boss is mean to me, you know, like HR-style complaints, which are always the top -- you know, the top numbers for any big company -- conflicts of interest, I don't want to say it's number one, but it might be close. In some years it might be the number one issue that people reach out about.

I want to say in any given year these days we have about 10,000 contacts a year where -- distinct contacts with people reaching out to ask questions or to report misconduct.  Typically about 60 percent of those -- 60 percent of those contacts are people proactively asking

questions, which is significantly higher than most of our peer companies, which again goes to our outreach and our approach to this. Conflicts of interest are probably, if not the biggest, one of the biggest areas of inquiry. I couldn't give a specific number, but it's a large volume.

Q   Okay. So you see it's kind of buried in the last -- very last sentence here. It says: "To indicate your understanding" -- I'm sorry. Let me slow down. "To indicate your understanding and acceptance of this offer, please view and acknowledge in our new hire site and review other pertinent online documents prior to your first day of employment." Then it looks like this is kind of a hyperlink.

What's the new hire site?

A   Given that this document is from 2013, I couldn't tell you. I don't know. It predates my employment here by five years, and my very strong assumption is that whatever this process is here is probably still not in place.

What I can tell you is that all new hires -- there is some type of landing site for new hires. I don't know if it's linked to a letter like this, but there is a new hire landing site. As part of onboarding, code of conduct training is taken by all new hires.

Q   Do you know what the current landing site is called?

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026

Page 28

A    No.

Q    Do you know if the current landing site is the same landing site regardless of whether the employee is working in Washington or some other state?

A    I would imagine that it is.  I can't say for sure, but I would imagine it is.

Q    Sure.

And this page, it's an acknowledgment; right?

It looks like Austin Hitch's electronic signature is in the bottom left, and on the bottom right it's dated 10/15/2013.

There's no, you know, kind of new school DocuSign tracking page, but, I mean, to the best of your knowledge do you have any reason to dispute that Austin Hitch electronically signed this letter?

A    I --

MR. NELSON:  Object to the form.  Foundation.

A    Yeah, I have no ability to say.  You know, I have no ability to opine on the authenticity.  It looks reasonable.  If you guys say it's -- if you say it's legitimate, I have no basis to dispute that.

Q    (By Mr. Cipriani)  All right.  I think you touched on this a second ago.

What department would have the offer letter template

Class Cert. 25

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026                                    Page 29

in its possession?

A    Acquisition, which is part of human resources.

Q    We are humming along.  Let me share another document here.

(Exhibit No. 3 marked for identification.)

Q    (By Mr. Cipriani)  All right.  So this is Bates stamped Cellco_Hitch002353 through 2385.  It's 33 pages.  I'm happy to scroll through this very slowly if you want to review every single page.

A    No.

Q    I'm not going to be talking about everything, and I'm sure you're very familiar with this.  You just let me know what you want to do.

A    Yep.  No, we -- I don't need to look at every single page.  If I could just see whatever is relevant to your question.

Q    Sure.

So this version has a date in the bottom right.  It's 2021.  I looked through this pretty closely.  I couldn't find, like, a month or an actual date that it was published on.

Do you have any idea when it was actually published?

A    I would have to look back at our records.  We do keep record of that.  If you look at the very last page, would

Class Cert. 26

it be on -- maybe go up a -- go down a little.

Q    Yeah.

A    No.  I would have to -- I would have to confirm that.

Q    No worries.

All right.  How did Verizon roll this version out?
Like, how did Verizon give this version of the code of
conduct to all of the employees?

A    So there is a code of conduct portal on our internal
website called VZ Web, and there is a similar portal on
our external facing site.  So the code of conduct is not
found in many places for quality control purposes -- we
don't want it floating around -- so we streamline it.  So
no matter where it's linked to internally or
externally -- or it's going to the same two spots -- but
my team will directly instruct the custodians of the
internal and the external site to post.

When codes of conduct are released, they're
generally -- generally released to management and HR, at
least more recently.  We may have released earlier
versions to all employees via email.  I can't say that
for sure.  I know that was more typical a couple years
ago than it is now, but all employees would have received
the most updated code directly there, from their
supervisors, from HR, or from us.  If it had any bearing,
if it had any change in policy that would affect them,

Class Cert. 27

you know, we would want to give those specific employees a heads-up, but generally speaking, it is -- not generally speaking. It is always included in annual code of conduct training as an attachment. So after you go through it, we provide it there so you have the latest iteration and employees have access to it.

In addition, throughout our, you know -- throughout every communication that we put out there, the compliance team puts out, you know, numerous -- whether it's gifts and entertainment, conflicts of interest, insider trading -- you know, choose your -- choose your ethical compliance issue. Both the compliance team, which is our -- the parent organization to ethics, as well as the HR organization, there's links to the code of conduct constantly in all of the communications, so it's put in front of employees with some frequency.

Q   Okay. Do employees need to acknowledge or see the newest iteration?

A   No. There's no -- there is no signature. There's no acknowledgment. There -- we've never seen the need to do that.

Q   Aside from the offer letter, right, where they're acknowledging --

A   Well, I think the --

Q   -- they're going to follow it?

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco -  May 20, 2026

Page 32

A      Yeah, I think that what it's saying -- I think the offer letter is saying, hey, look, you're acknowledging -- and you can go back to the offer letter for a second.

Q      Yeah.

A      I think the offer letter, it's not -- while the code of conduct is included as one of the items there, the offer letter is basically saying, hey, I'm accepting employment.  These are my rewards.  These are the things, and yes, I have to abide by, you know, the principles here in this code of conduct.  It's the policy that employees -- it's part of our culture.

It's not saying, hey, you know, I'm signing up for some specific provision.  I mean, you don't see anything outlined here, so I think it's more of a generalized acceptance of my rewards, our culture, our benefits, what you're going to do, what the incentive plan looks like versus the code of conduct, which is, you know, subject to change, something that we roll out to employees and say, "Look, this is how we expect you to behave."

It's not that we're asking you to sign in blood. We're not going to tell every single person here to sign off on this or "You have to agree to this."  It's this is how we do things as a company, and it's obviously part of being a V teamer.

Q      Okay.  Let me go just a couple pages in here.

Class Cert. 29

All right.  I know this text is pretty small.  Let me try to zoom in here.

A   I can see it now.  You're good.

Q   So this is, like, the introduction section; right?

The second paragraph here -- I think you mentioned this earlier -- it says, you know:  "You must follow the law, the Code of Conduct, and all Verizon policies and guidelines."

A   Mm-hm.

Q   So we obviously know the code of conduct.  You know, I suppose some people might know the law.

And then it says "all Verizon policies and guidelines."  What other sets of policies and guidelines are there aside from the code of conduct?

A   So keep in mind this applies to all employees globally. So we do have corporate policy statements that might apply to, you know, senior executives.  For instance, we have a corporate policy statement that regulates, you know, gifts to charities using company funds.  We have another one that regulates, you know, interactions with public officials, another one that provides the sign-off thresholds for how much somebody at a certain rank could spend without getting permission from their management or the CFO.

So there are other corporate policies.  The general

policy that's applicable to everybody, though, would be the code of conduct. So, like, we don't have a specific code of -- we don't have, like, a separate conflict of interest policy. Some companies do have that. We left our code broad enough where it applies to everybody, but the general corporate policies, though, tend to be something that's governing processes more than -- more than people or individual conduct.

I think that's actually the best way to put it, is most of our corporate policies are governing processes and how we do things versus conduct, misconduct, what's ethical, what -- you know, what is -- how we're conducting ourselves with integrity. That would be most of the code.

Q  Makes sense.

Let me scroll down here. Excuse me.

As I'm thumbing through this, this is kind of just all kind of general policies; right?

I guess this is the drugs and alcohol policy. I mean, does Verizon expect its employees to follow this drug and alcohol policy?

A  We -- so we expect -- we expect our employees to follow the code of conduct, but the code of conduct is a case-by-case application.

So, for instance, drugs, yes, we don't want somebody

"This is just a starting point."  And it's to outline those expectations that we then -- when something arises -- we can tell employees before even something arises, "This is how we expect you to behave.  If you don't conduct yourself a certain way, we're going to look at it," which is why we have an ethics team to ask questions and why we have an investigations team to look into potential misconduct.

Q   Sure.

    Does Verizon utilize a progressive discipline policy?

A   So we do.  We do, and I think it depends.  Again, it depends on the situation.  There are -- there are some situations that are very serious.  You know, you bring a loaded firearm into the office.  It's going to be treated differently than maybe somebody, you know, broke a sales -- you know, a sales practice procedure that they kind of just blew it and weren't thinking.

    So things are treated -- different circumstances are -- again, this is -- we operate on a reasonableness basis.  It really just depends -- depends on the case.

Q   Okay.  I'm going to scroll down here.

    So this is the outside employment policy.

A   Yep.

Q   Obviously we all know this is kind of, I guess, the basis

Class Cert. 32

of this lawsuit; right?

So this first paragraph, can you just read that for me?

A    You said the first?

Q    Just the first paragraph through the second bullet point there.

A    Okay.  Verbatim.  "You may not -- with or without compensation -- be self-employed or employed by, consult with, own, perform services for, or aid:  a company or organization (including a charitable organization) that is a vendor, supplier, partner, contractor, subcontractor, or competitor of Verizon; or a company that provides services that are provided by Verizon, or that Verizon is seeking to provide."

Q    Does Verizon expect its employees to follow that?

A    Verizon expects its employees -- and I think if you go to the next paragraph, it says to consult with Verizon Ethics.

So again, this gets to how you approach the document, from our intro -- intro forward, which is this is the expectations of behavior, but everything is a case-by-case basis.

And it says here, further down -- the very next paragraph -- "Exceptions to the requirements of the previous paragraph may be granted only upon written

approval of Verizon Ethics."

Q    Right.

A    So what we're saying here is, look, we want employees to -- who are looking to do these things to reach out to us.

And if you look at the sidebars, which are explanatory, you'll see designing apps, a side hustle, must be approved by Verizon Ethics.  "How do I find out if the company where I have a second job" -- I'm sorry. I don't mean to -- for the court reporter, I apologize. I didn't mean to read out loud like that fast.

If you look at the sidebar, the first one at the top there -- "How do I find out if the company where I have a second job is providing services that are provided by Verizon?" -- we're telling people, you contact us.

So if you fall into one of these categories, our expectation is you call us.  You don't have to call us for every job.  We have people who have jobs who are completely unrelated have not come to Verizon Ethics, and we wouldn't have a problem with it.  What we're looking to do here is make it so that employees who might touch on something that's a conflict with us, that might put themselves in -- either us or themselves in jeopardy by having a certain relationship, that they come to us, have the conversation, and that we're able to then address it

appropriately.  It's not an absolute prohibition, as that paragraph makes clear.

Q   So you're talking about this first kind of sidebar thing, we'll call it.

Why does Verizon care if an employee's second job is providing services that Verizon provides?

A   We -- for a lot of reasons.  If we are -- we're providing telecom services, and we have someone in a second job who is also providing the exact same service, say, for a competitor, that could raise a lot of primarily conflict issues.  There's loyalty issues.  There's practical scheduling issues.  But from a conflict of interest perspective, we would be concerned about, you know, the use of -- I mean, where to even begin?

If you're working for us and you're working for a competitor across the street, you know, it involves the possibility of misuse of -- and I don't think -- it's not a theoretical possibility; it's a very practical and actual one.  There's pricing.  There's scheduling. There's inventory issues.  There is, you know, privacy issues with CPNI and customer information.

You come into our store, provide information to our people, and then one of our -- one of our people who a customer has provided information to also works across the street.  That CPNI -- I'm not sure if you're familiar

with the term, but it's consumer proprietary network information. It's the amount of lines you have, pricing around them, what you use it for. The type of conversations that you would have when you go into a cell phone store, just a regular off-the-street consumer would have when they go into a store, that information could be used to tailor a package that a competitor could use. So if you're seeing that information, our people are spending time with you, we would have concerns if you were taking that information and then able to use it for a competitor. So I think that's just an example of why we would have a concern.

Q    Okay. And in that example -- I mean, doesn't Verizon have a confidentiality policy?

A    We do.

Q    Okay.

A    Confident -- it's here. It's the code of conduct.

Q    All right. Going back to kind of the main outside employment --

A    Well, if I -- if I may?

Q    Go ahead. Yeah. Yeah, please.

A    So -- and I understand. So employees do -- and we trust our employees to keep matters confidential, but if you're on both sides, it gets to, like, the issue of basic -- I guess an example would be fiduciary duties. It's hard to

unknow something, and when you have a duty to both employers and you know something, as much as you might try to keep that separate, it's not that you'll necessarily use that information, but a customer who comes into our store and trusts us with information, or if we trust our employees with pricing information, product information, inventory information, it's hard to not -- it's hard to unknow something.  So it's not necessarily that they're intentionally going out of their way to harm Verizon, but at the same time, it's hard for them to be on both sides of, you know, trying to meet the sale.

And in addition -- if I can just point this out -- one of the concerns that we would also have is, you know, that doesn't just level our information flowing to our competitors.  One of the things -- you could look at our trainings, look at our code.  We always talk about doing business fairly, and one of the things that we really care about here is not being -- we're not a -- you know, we're not a fast-talking group of snake oil salesmen.  I think one of the things that we really pride ourselves on is a high level of sales practice, integrity in the sales practice space, and I think on -- really on helping customers.

So one of the things we don't want is for, you know,

Class Cert. 37

an employee of T-Mobile or AT&T -- or name your competitor across the street -- one of their employees is now coming over to us and then funneling their information over to us, or talking to their -- you know, basically saying to, you know, a potential customer across the street to -- of a competitor, "Hey, you can go over to Verizon and get a better deal.  I know there's going to be a sale tomorrow," or "I can get you a better deal on accessories over at Verizon."

Phones might be similarly priced, but, you know, accessories might be cheaper across the street.  We don't want to benefit from that.  One of the things that we want to do is gain business the right way, so the appearances of that conflict, very real, actual appearances there, are something that we have concerns about.

And that also goes to, like, collusion and price fixing.  You know, I mean, it just -- I could sit here and just keep going on, but that's why we have significant concerns here.

Q    Sure.

Do -- does your run-of-the-mill, you know, retail sales guy have any control over, like, Verizon pricing?

A    No, but they have control over sales practices, sales techniques.  You know, individual stores train.  You'll

Class Cert. 38

have managers who spend time, effort, resources, money to cultivate our sales force to compete in a very tight marketplace where there's only a handful of competitors, you know.

So our sales practices -- they might not have, you know, weeks worth of -- you know, weeks worth of prior knowledge -- they might not have information the same way senior management might and -- you know, they might get pricing that morning. So it's not pricing as much as it is the sales tactics.

Inventory is super important. You know, they're going to have a very good view of what our inventory is like, and that does affect sales. That does affect drivers. That affects a lot. And again, that gets to the accessory issue.

And they also have access to schedules, and they're able to -- you know, in our space, especially around peak sales times, we wouldn't want somebody working for a competitor of ours, or we would be concerned about somebody working for a competitor of ours if, you know, we had to fight over -- like, with our competitor over scheduling.

So it's not -- it's not just a pricing thing. That's part of it, but I think there's a much bigger picture, and the front-line sales -- the front-line sales

Class Cert. 39

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026

Page 44

teams and the sales specialists are privy to a lot of information that they do learn in house that could then be applied to other places.

Q  Okay.  I mean, correct me if I'm wrong, but it sounds like kind of at least one of your concerns is Verizon's ability to control its employees; right?

A  No.  I don't think it's controlling employees.  I think it's protecting -- I think a couple things.  I think it's protecting customer information.  I think it's protecting our -- you know, we have a business to run, so it's not trying to control employees.  And one of the things that Verizon Ethics again has prided itself on, and why we have so many contacts year after year and it increases, is because employees know we try to give them as much latitude as possible.  We are not the dean's office.  We are the office of -- you know, we don't say no.  We say "yes, but" and try to get controls in place.

When employees come to us, it's important to them, so every single matter that comes our way -- that's why again -- like, when I took this job, I was told not the smallest case -- the number one way for me to get fired is we miss a case.  Like, that is the quickest way.  Somebody calls with something that's seemingly inconsequential, and we blow it off; we give it the back of our hand.  It's important to that person, and if

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026

Page 45

they're trying to make money for their family, they're trying to figure out how to better themselves, they're trying to figure out how to get experiences, we're there to help them do that to the greatest extent possible. And that's what we -- that's what we've always done.

So when it comes to controlling employees, absolutely not. We're trying to channel our employees to conduct themselves in a way that protects their own reputations as well as Verizon's.

Q   Okay. And part of that explanation, you said "yes, but," right, but if you read this outside employment policy, doesn't it say you may not --

THE REPORTER: Can we hold on one second? I think --

MR. CIPRIANI: Yeah. Sure.

THE REPORTER: Did we lose the videographer, or is he still on here? Nope. Okay. Thank you. Sorry. I just saw somebody go off, and I didn't see him still on the screen.

MR. CIPRIANI: Oh, no worries.

Q   (By Mr. Cipriani) So it says -- you say "yes, but," but if you read this policy, isn't it no, you can't work for a competitor, but there are exceptions?

A   So this -- and this is why the code of conduct in its intro says, look, this is a starting point. And the code

of conduct is written in a way where employee -- it's designed to encourage employees to have these kinds of conversations with us.

If you were just to rewrite the code of conduct to say "You could basically work anywhere, but when these things happen, you must come to us," that would be in my view controlling employees.  It's "You must come to Verizon Ethics for these things," and you -- or you must do X, Y, Z.

Versus here it says, look, this is what we -- this is what we don't want, but you could get an exception here, and we have a robust exception process and -- you know, you've seen it in production.  We say yes over and over and over and over again.  I have to struggle to find places where we say no.

Q   What are you referring to, "in production"?

A   I'm sorry?

Q   You said in production you see --

A   No.  No.  I think you were given a couple -- you were given -- you were given cases in the state of Washington; right?  I saw them.  They were Bates stamped.

Q   Cases in the state of Washington?

A   Not cases.  I'm sorry.

So you were -- you were provided -- you were provided with Bates stamped -- I believe, three or

four -- three or four matters where we provided approvals; correct?

Q    No.

A    Oh, maybe not.  Okay.

Q    Okay.

A    So what I'm saying is we -- here's what I'm saying, is that when you -- when you look -- when I think of -- when I think of approvals, and when I think of when we go through and get requests, it is -- it is extraordinarily rare for us to tell an employee no.  When an employee comes to us and asks, "Hey, can I do something?" the answer is almost always yes.  It is generally speaking in a direct conflict where it's just irreconcilable and defies logic that we say no.  I guess that's what I'm trying to say.

Q    Okay.  Have you ever said no?

          MR. NELSON:  Object to the form and scope.  It's not limited to state of Washington.

A    In the state of Washington I cannot recall a single instance of saying no.  No.

Q    (By Mr. Cipriani)  Does the ethics team maintain some type of -- I don't know -- rubric or decision tree for assessing employees that come to you guys asking to work for a competitor?

A    We -- we ask -- we have a -- I don't want to call it a

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026

Page 48

standard email because we don't have, like, an official standard email. We've all just been doing this long enough to know what to ask for, and we will ask, "What is the nature of the job?" "Who is it?" You know, "What will you be doing there?" "What is your -- what will your title be?" "What will your interactions with Verizon be?" You know, "Will you be directly competitive with us?"

We want to know basically -- and again, this goes to the case-by-case basis. We want to know exactly what you're doing so that we can look and see what you do for us to understand if it's something truly competitive.

One thing -- one thing that we don't do here -- and I say this to our executives all the time, and it's, I think, why ethics has a seat at the table -- is we don't solve for nonproblems. We don't solve for theoretical problems here. We only care about -- you know, we care about real problems, real situations and real risk.

So if an employee comes to me and says, "I want to do X" -- you know, I remember years ago we had -- we had something in the bank -- and this was many years ago that pops into my brain. We had something in, like, the banking space. I remember Verizon was touching banking, and at the end of the day it really wasn't that much of a conflict. And I'm like, yeah, if you wanted to be a

Class Cert. 44

stickler about it, you could say no, you can't do this. And I remember -- you know, I remember giving the green light to it, and it's just because when we talk as a team and we talk these things through, it's -- we really have the approach of, come on, is this really going to hurt us? Like, is there a real risk here?

And if it's low risk, especially -- you know, the lower the rank -- the lower ranked employees, we're going to be a lot more permissive with. There's a lot less risk at the lower levels. If you have a more senior person, yeah, you don't want -- you don't want -- you don't want one of your senior directors doing the same job for -- you know, for a competitor. That would be a problem. You don't want your strategy people also doing strategy for your competitor -- that's a problem -- your finance people.

But we are a lot more permissive the further down the ranks you go because, frankly, the risk -- the risk is lighter, and the consequences are more severe on the employees. If you tell me I can't have a second job, that's less severe than somebody who makes less. So I think that we really -- when we're considering these types of questions, it's a holistic view. It's again case by case, and we really want to understand is what the employee is planning to do, is that something that's

Class Cert. 45

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026

Page 50

truly going to create risk, hurt Verizon, or put Verizon or the employee in a bad spot.

Q    Okay.  I appreciate that.

I guess why don't you guys just say, you know, "This only applies to, you know, high-ranking employees"?

A    No.  It applies to -- it applies to everyone.  I'm saying that the implementation of this and how we view it is on a case-by-case basis.

So, for instance, if you want to be employed by one of our vendors, but you're a senior person in our sourcing organization, that's going to be more of a problem than if somebody in one of our stores wants to be employed -- if someone who sells phones for us in a Washington store wants to be employed by -- you know, wants to be employed by a vendor of ours and there's no real risk there.  We're going to say yes.  It's just a matter of having someone who's making purchasing decisions work for the -- you know, for the vendor we're purchasing from, that's a problem, or it can raise the appearance of a conflict where there's really not an appearance of conflict just because, you know, here in Basking Ridge we might have a deal with a vendor that the employee in Washington has no relationship with, has no influence over.  That's the kind of thing where we'll say, yeah, of course, you could -- you know, knock

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026

Page 51

yourself out.  You can get -- you could get two jobs there.  That's not our -- that's not our concern.

So it's not that the rule doesn't apply.  It's written like this to be broad and to be a policy so that then we can look at things, work with employees, just like the sidebar says, like the intro to the code says.  This is the starting point, and we have those discussions.

Q   Okay.  What if, like, a retail employee wanted to go work at AT&T on the weekends?

A   Again, it would depend.  You know, it just depends what they're doing for AT&T.  It depends on what they're doing.  There's not a categorical no here.  It's again, you know, what are they doing, where are they doing it.  It's a -- it's truly an individualized risk analysis.  If there's any way for us to say yes, we're going to say yes, and that's just the way we operate.  If there's a conceivable way for me to get to a yes on something, even if I have to put controls into place, we're going to do that.

So if somebody wanted to go work for AT&T's fleet -- we have somebody in a store who sells phones for us in one of our Washington locations, but they're a great mechanic and they want to go work as a mechanic for AT&T's fleet -- we have the duty of confidentiality.

BA LITIGATION SERVICES

Class Cert. 47

They're not in the stores.  It's not like they're stealing customers or diverting customers or we have to worry about AT&T accusing us of stealing or, you know, diverting customers to us.  They're going to go turn a wrench in a garage and work on -- you know, be a diesel mechanic for some of their -- some of their service trucks.  I could feasibly see that being a yes with some -- with some coaching of, you know, "Please make sure you keep your worlds separate."

So that's where -- that's where it's not just a black-and-white answer.

Q    What if that -- in that example, what if that retail employee selling phones for Verizon wants to go across the street and sell phones at AT&T?

A    I think we would find it problematic.  And again, case by case.  We would have to look, but all the issues I raised earlier, whether it's, you know, loyalty, scheduling, whether it's the conflicts with knowing, you know, pricing information, diverting -- diverting customers, sales techniques, inventory, those matters come into play.

I don't want to be accused of stealing AT&T's customers.  I don't want to accuse them of stealing our customers, so -- but it's not just an appearance issue.  It's truly an operational issue.  So again, it's a little

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026

Page 53

hypothetical, but we would -- we would likely be more concerned about that than somebody looking to work in a garage or in a not directly competitive position.

Q   Have you ever told a -- like, a retail sales employee they can't go work at AT&T doing the same job they do at Verizon?

MR. NELSON:  Object to the scope of the topics.

A   Yeah, I would say to the best of my knowledge I'm unaware of anything -- of ever saying no in the state of Washington.  And I would know.

Q   (By Mr. Cipriani)  Does Verizon maintain -- well, strike that.

So, you know, just to go back to this actual policy, right, it says:  "You may not -- with or without compensation -- be self-employed or employed by, consult with, own, perform services for, or aid:  a company or organization (including a charitable organization) that is a vendor, supplier, partner, contractor, subcontractor, or competitor of Verizon."

Does Verizon maintain, like, a vendor, supplier, partner, contractor, subcontractor, competitor list?

A   No.  We've been asked that question before, and the answer is -- the answer is complicated.  Yes, our risk management teams maintain some lists, and I believe it's

for, you know, large enterprise vendors that we do a certain degree of, you know, standard diligence on. The -- from an ethics perspective for, like, you know, conflicts and that, no, we don't keep any kind of a list. So to the degree we would be checking employees here, the answer is no. We depend on employees to come to us and proactively seek guidance. And again, why this is -- yeah, we depend on them and their honesty.

Q    Okay. And you said you've been asked that before. What was the context of that ask?

A    I'm sorry. Asked...?

Q    You said you've been asked before whether Verizon maintains lists of vendors, suppliers, partners, competitors --

A    Oh --

Q    -- that sort of thing.

A    -- I think it was in terms of, like, a corporate governance issue several years ago.

Q    Okay.

A    Yeah. Nothing to do even remotely with this -- with this issue.

Q    Okay. And do you train your staff on evaluating when to permit exceptions to this, you know, general prohibition on working for competitors and partners and stuff?

A    Yes.

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026

Page 58

MR. NELSON:  Paul, we can see your outline.

MR. CIPRIANI:  Oh, shit.

**THE WITNESS:  Oh, that is -- sorry. The good news was it was small.  I had to lean forward.**

MR. CIPRIANI:  I'm sure it's super riveting, so...

MR. NELSON:  I couldn't read it.

MR. CIPRIANI:  Here it is.

Q    (By Mr. Cipriani)All right.  Hopefully you're looking at the Code of Conduct.

A    We are.

Q    Great.

MR. CIPRIANI:  Thanks, Kyle.

Q    (By Mr. Cipriani)  All right.  So I scrolled down a little bit.  So this is Page 18, Bates stamped Cellco_Hitch002370.  It's -- and I'll scroll back up just so you can see where it's at.  So it's within this, you know, broader Conflicts of Interest section, I guess you want to call it.  It's specifically the outside financial interests section.

I'd imagine you're familiar with this section; right?

A    I am.

Q    Okay.  So the first two paragraphs, they're kind of

B&A LITIGATION SERVICES

Class Cert. 51

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026

Page 59

straight forward. This last paragraph I was curious about. It says: "You may not take a significant financial interest in a company that is a business provider or that competes with or is in one of the same lines of business as Verizon. A significant financial interest is any financial interest that is more than $100,000 and that represents either (1) more than 25% of your annual gross income or (2) more than 1% of the value of the other company." And then it says: "If any investment appreciates over time so that it creates an actual or apparent conflict of interest, it should be brought to the attention of the Legal Department."

Have you ever -- or has your team ever conducted any investigations related to this outside financial interests section?

MR. NELSON: Object to the scope.

A    It comes up from time to time. It's rare because in order to be triggered, it's a lot of money. You know, you have to have at least $100,000. It needs to be more than 25 percent of your annual gross, the value of your 1 percent of the marked half of the company.

So, like, you know, what this is meant to do is ensure that senior executives are not trading with medium-sized suppliers they might have, you know, a large financial interest in and that they're -- so, you know,

Class Cert. 52

we have had to deal with this before.  Generally it's in the question of -- it comes to us as a question.

Have we dealt with it as an allegation of misconduct?  I'm sure at some point.  I can't recall that being the case.  The times that I do remember it coming up -- it comes up maybe a handful of times a year.  When it does come up, it's somebody reaching out to us and saying, "Hey, I think I might fall into this category.  You know, let's work our way through it."

Q   (By Mr. Cipriani)  Okay.  The --

(Cross-talk.)

A   I do not recall --

Q   (By Mr. Cipriani)  I'm sorry.

A   We -- I don't think we disciplined somebody on this.  I don't think -- you know, this is generally in the -- you know, again, sparks the conversation to make sure that people are speaking up.  This way they avoid a problem.

Q   Okay.  In the theoretical, could it be a violation if, you know, an hourly employee in Washington, you know, opens a kiosk at the mall where they are selling cell phone cases if they, you know, make over a hundred grand doing so?

A   Theoretically, yeah.  It applies to everybody.

Q   Okay.  How about, like, a cell phone repair business?  Same thing?

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco -  May 20, 2026

Page 63

Q    Okay.  Why does that include the word "compete" then?

A    Well, it would be competitive at the thrust of this because we're -- here again, once again we're talking about -- we're talking about the securities, and it's to prevent the self-dealing.  So we don't want somebody who is again a senior executive or somebody who works for us -- it usually comes up in the senior executive context.  We don't want somebody who works for us putting money -- significant sums of money with a competitor unless it's cleared by us.

Q    Okay.

A    So just like the conflict provision, it's not a general prohibition.  This is a guideline; it's a policy.  And just like the -- just like the conflict provision, it's "Bring it to us."  "Bring it to the legal department." And by the way, the legal department here is us.

Q    Okay.  Why doesn't this section include the same, you know, "Bring it to the ethics department" language?

A    What's that?

Q    Why doesn't this section include the same "Bring it to the ethics department" language?

A    The outside financial interests section, why does it say legal instead?

Q    Yeah.

A    I think later iterations of the code we changed it to

Class Cert. 54

Verizon Ethics.  You know, I think that traditionally the legal department -- the legal -- ethics is part of the legal department, so for the longest time you could bring it to your line of business lawyer, and they would bring it to ethics, but we've tried to streamline that.  It's part of efficiency, not going to five different places.  Ultimately, it would always come to us anyway, and we've just made it that much clearer.

Q    Okay.  Excuse me.

     And you said legal line lawyer?  Did I say that right?  What is that?

A    The line of business lawyer.  That's the lawyer -- the commercial lawyer who's assigned to the group.

     So if your -- people can go to their line of business lawyers and, you know, ask general legal questions.  It's basically, like, your group general counsel or your local general counsel.  Everybody in the legal department, every lawyer, every paralegal, every -- everyone knows that if an ethics question comes, they're not to opine on it.  They don't give exceptions under the code of conduct.  They don't -- they don't determine what conflicts are.  Only Verizon Ethics determines conflicts.  Only Verizon Ethics interprets the code.  Only Verizon Ethics is who can give lamers [phonetic].

Q    Okay.

THE REPORTER:  I'm sorry.  Say that --

Q  (By Mr. Cipriani)  And I don't want to belabor this next point because I know we can -- Kyle and I can probably resolve this in, you know, written discovery or during a meet and confer or whatever, but -- so we received -- or we know about the Verizon's 2021 code of conduct that we just went through.  There's another version called 2.0 that I don't think had a date on it, and then there's an April 2023, a July 2023, an October 2023, and a November 2024.

I know that's a lot to digest, but are you aware of any other versions of the code of conduct that have been operative in the last few years?

A  No.  That sounds like -- that sounds like more than I remember.  No.  I think that that covers them all.  I believe code 2.0 was the original 2019 iteration, and that's why it was called 2.0 when we went through Verizon 2.0, when Hans Vestberg became our CEO.  So that would, to the best of my knowledge, be the original foundational one.

Other editions that you've seen after that have been very small tweaks, very small tweaks.  When I tell you substantively, especially in outside employment, I'm fairly certain there was zero changes.  The main changes were sidebars and a handful of -- I can't remember

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026

Page 66

exactly where the changes were, but there were some small changes. I do not believe they were in the conflict section.

Q    Okay. And I know, gee, about an hour ago now we kind of briefly talked about, you know, canvassing, you know, like, local laws. Leading up to 2020, when the statute that's at issue in this litigation was first enacted, did your department do any type of analysis to make sure that their codes were in compliance with the new noncompete laws?

MR. NELSON: Object to the form to the extent it calls for attorney-client privilege or work product information.

Glen, you can answer to the extent it doesn't reveal any impressions with counsel or communications with counsel.

A    Yeah. Our -- we would, as a legal department, evaluated the matter to -- you know, how we do that I think would be privileged, but we do, as a matter of course, make sure that all our codes, policies are not in conflict with the jurisdictions in which they operate, and the code of conduct specifically says that if the code in any way differs from what is -- you know, what the operative law regulations are in a jurisdiction, that those are to govern instead of the code.

Q    (By Mr. Cipriani)  And did you guys do an analysis for Washington in 2020?

MR. NELSON:  Same objection.

A    I mean, I would -- I think that would be privileged.

Q    (By Mr. Cipriani)  All right.  Let's move on.  Let me drop another exhibit in the chat.

A    Paul, you're going to pull it up on the screen; right?

Q    Yeah.

A    Okay.

(Exhibit No. 4 marked for identification.)

Q    (By Mr. Cipriani)  All right.  Hopefully you can see my share screen.

A    I can.

Q    Cool.

So this is Bates stamped Cellco_Hitch003364 through 3508.  This is a massive file, so -- I can go through it. We're not going to look at all of these -- all of these pages, but you just let me know what you want to do.

A    We do not need to go through it.  This is our privacy and information security training.

Q    Okay.  When does a -- when does a Verizon employee get prompted to complete this privacy information security training?

A    So all employees receive code of conduct training, a new

employee code of conduct training, and new employee -- new employee privacy information security training at onboarding.  It's a large comprehensive, you know, training regimen.

The -- what you're seeing here was the -- it would have been new hire, but also what we've used for -- what we used for periodic training.

When would they have seen this?  They would see it in most likely the summer.  I think we've generally conducted code training in -- sometime between July and August, July and September, so this would have probably been late summer of twenty -- it looks like 2022.

Q  Do all current employees have to go through this, or is it just the new hires?

A  New hires go through really comprehensive training, and then what we've done is in 2022, 2023, 2024, we basically had still, you know, lengthy 45-minute-long training that would have been fairly identical to this, to what's on the screen.

The training -- yeah, they would have -- they would have received the training -- how did they -- they would get it by email, and then they have a certain amount of time to complete.

Was that answering your question?  I'm sorry.

Q  Yeah, that's great.

So they get a certain amount of time to complete. So what happens if they don't complete it?

A   You get lots of calls from compliance.

Q   Okay.  I don't want to spend too much time on this.  Let me skip down to the relevant portion here.  Let me see if I can find it.

Here we go.  All right.  So this is Page 127 of the document, PDF Page 126, Bates stamped 3489.  From my understanding, this is kind of the conflicts of interest section of the training program.

Did your team put this section together?

A   Probably.  Yes.

Q   Okay.

A   Yeah.

Q   So these are -- I think there's just a couple questions. Yeah, there's two questions here.

A   Paul, before you get to those questions, can I just clarify the way the training -- the way the training operated?

Q   Yeah, of course.

A   So what you're looking at here is the privacy and information security training.  There were two sides to training, an A training and a B training.  A is -- what we would call A unofficially is the general code of conduct, and then the other is privacy and information

security, and they act as compliments to one another.

There is some conflicts of interest training in the privacy and information security training, but the main conflict of interest training is in the -- is in the A course.  So yes, this is the training, but their employees would see both of these.

Q   Okay.  And I think we'll get to the A side right after this.

A   Yeah.

Q   Let me zoom in here.  It's kind of small.

It says:  "7.5 conflicts of interest."  This is kind of like a hypothetical here.

A   Okay.

Q   I think this is just a general statement about conflict of interest.  And then here -- so here's the first hypothetical.  This is about a guy named Jetson.  "7.6 second jobs MCSA."

Do you know what "MCSA" stands for?

A   No.  MCS- -- no.

Q   No worries.

A   It says:  "Late night endeavors.  Jetson works in Verizon's IT department and does highly specific network engineering for the company.  He recently got a second job working overnight for a small healthcare company that hired him specifically for his experience in IT."

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026                                    Page 71

And then the question posed is: "Is this a conflict of interest?"

And then there's three options; right? And the slide beneath indicates that the correct answer is: "That certainly is a gray area...I'm not sure."

Which, you know, kind of comports; right?

Q    Okay. All right. And then this next page, it gives, like, an explanation of the correct answer and I think the explanation of the wrong answers.

And it says: "That's right. While Jetson's side gig is with a healthcare company, it may still create an impermissible conflict of interest. Verizon operates in many different sectors, including healthcare, and Jetson may (unknowingly) be working for a customer, partner or competitor. He may even be providing a service that Verizon sells."

So, I mean, is it safe to say this is saying it's a gray area because Jetson doesn't know whether his night job in healthcare competes with Verizon or is for a Verizon customer or partner, so he has to ask?

A    Yeah. What you'll see in our training -- any training you look at from Verizon Ethics, we're trying to spark the conversation. It's very rare of us to say something is black and white, you know. What we're trying to do is we're trying to get people to think about things through

Class Cert. 62

a certain ethical lens and then raise their hand and say, "Look, I'm doing -- I'm doing this thing. I have this side gig." "I have this investment." "I have this" -- whatever. "Let me go call the ethics team and figure it out. It might be a gray area. I'm not sure. Let's chat it through."

What you won't see here is that categorical prohibition. "This is -- you can't do this. That's not the way."

There are situations where we do say, you know, "That's" -- you know, "Can you, you know, steal?" "Can you use, you know, customer information for your own advantage?" The answer is no, but again, case by case what we're trying to demonstrate through our training here is that you need to come to us and have these discussions, and the ethics and integrity here at the company, there's an expectation that we treat every single case as it comes our way and that we want people to bring it our away proactively.

And this is part of encouraging -- this is the types of training that we've credited with having our numbers really, you know, sky rocket, our case volumes, and that is because people are seeing these trainings and saying, "Oh, wait a minute. I have this job" or "I have this relationship. Let me go run it by the ethics team."

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026                    Page 73

So yeah, that's consistent with what we're seeing.

Q   Okay.  How about this next one?  It's about a guy named Malcolm.

Would you just read this question for me?

A   "Malcolm is a Verizon engineer who works in the cloud security space.  His oldest child starts college in the fall, and Malcolm would like to earn a few extra dollars by providing consulting services for Traquair Corp.  The job with Traquair Corp. does not involve cloud computing or have any relation to Malcolm's Verizon job responsibilities.

"But Traquair Corp. is also a competitor in the prepaid phone space and is aggressively looking to expand its market share.

"Can Malcolm consult for Traquair?"

Q   Okay.

A   "Yes" --

Q   There's two options here; right?  Option A is:  "Yes, this is fine.  The work he's doing is unrelated to his Verizon job."  And the next option is:  "No, he can't work for a competitor."

A   Right.

Q   Which one is the correct answer to this question?

A   "No, he cannot work for a competitor."

Q   Okay.  So why is this a -- like, an unequivocal no?

Class Cert. 64

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026

Page 74

A    Because it's somebody who's working in our engineering space. So one of the things that we would want to hammer home here is that, look, you know, you're one of the people who is in our cloud security space. This is where we're building things. This is our most -- one of our most secure assets. You know, having a job that's basically working for a competitor in the prepaid phone space where they're looking to expand or going to depend on cloud security -- that's -- that's going to be, you know, an integral part of any kind of expansion -- that would very likely be a no. So on these specific facts here, this would be unlikely for something that we are -- it would be unlikely for us to want to approve this.

Just because this specific circumstance says no -- and I think this -- you have to read it with the one that comes before it. You have to -- you know, we want people to come to us and say, "Hey, this is a no, but, you know, the code says come have this discussion with us. The other -- you know, the situation right before this, hey, it's maybe a little closer to mine."

So what we're saying is we have certain standards, certain expectations. We expect our employees to understand the lens with which we're looking through things, but still this doesn't say, "Don't reach out to us." In fact, again you'll see throughout the refrain of

this entire code training is "Reach out to ethics."

Q   Yeah, but if we go back to the one we just looked at, it says, "Always reach out to Verizon Ethics."

And then if you look at the one we're talking about now, it doesn't say that; right?

A   Well, because the one before it said it.  I mean, it's the same training.  So if you read it, you know, together here, you have a situation where you're saying, "Look, there's these two areas.  One is a little grayer than the other, but, like, always reach out to Verizon Ethics."

And again, you know, we say -- throughout the course here, I think anybody reasonably looking at this would say, you know, "I have a question.  We should reach out to ethics."

It says it at the beginning of the course; it says it at the end of the course says; it says it, you know, embedded in half of these questions.

Q   But it doesn't say it here; right?

A   It does not say it there.

Q   Okay.  And then you mentioned, you know, the specific facts.  And maybe you read something in here; maybe you didn't.  It says:  "This job" -- "The job with Traquair does not involve cloud computing or have any relation to Malcolm's Verizon job responsibilities."

So why is it still a hard no?

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026                                    Page 76

A   Because he's a Verizon engineer.  He's not a front-line -- he's not a front-line employee.  This kind of gets to what I was saying earlier about the more front line you are, the more permissive we would be.

We are going to have -- we are going to take a more restrictive view with our senior folks, our engineers, our lawyers, our -- you know, our core planning people than we would with somebody who is either, you know, selling in a store, managing a store, or working on our, you know, front-line infrastructure installing FiOS in a house.

So we would send -- with this we're sending the message, hey, mid-level managers in our -- you know, in our engineering team, this is the type of thing that we don't want you doing.

Q   And then why doesn't Verizon want these types of workers doing this type of thing?

A   We wouldn't want a Verizon engineer who is working in our cloud security space working for a competitor in general.

Again, there could be -- and I -- we've let senior executives do things where -- we've let senior executives work for or have relationships with -- maybe direct competitor is the wrong -- the wrong situation.  I don't want to speculate too much.  For a situation like this, for a mid-level person who is in a sensitive job, we

Class Cert. 67

wouldn't want them using their competitive know-how to then push a competitor forward. We wouldn't want them using their specialty skills to -- as an engineer in cloud security space to then go work with one of our competitors.

Q Even if Verizon has the knowledge that that second job with the competitor doesn't involve what they're doing for Verizon?

A I mean, I think in this space again it gets to the restriction -- it gets to how we look at things. It's unreasonable in my view for us -- if their -- if the jobs are completely unrelated, for front-line sales folks it would be unreasonable to say, you know, you can't work for somebody.

I think it's very reasonable the higher up you go, to our more highly compensated folks who have, you know, insight into management -- they have insight into our procedures; they have insight into our planning, our long-term planning. So someone who is a -- one of our engineers -- even mid-levels don't have a lot of information about where is the company going, what are we doing, what are we planning, how do we execute on certain things. Even if that competitor doesn't at present have a directly competitive product or service, having our person work with them, work for them opens up the

Class Cert. 68

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026

Page 78

possibility that they will do so.

Verizon engages in business that is either telecom or adjacent to the telecom space, and when this training was rolled out back in 2022 -- keep in mind we had big media -- we still had parts of our media, like AOL, Yahoo. We were a little bit of a different company then. It was a lot more exposure areas. But for a place -- for someone placed like this, we would be concerned about future state planning, how they're going to be using that information, what the appearance is, how much we can trust them. That's not going to be the same with front-line employees.

Q   Okay. And in the middle of the entry you mentioned highly compensated; right?

So where does Verizon draw the line when it comes to compensation and that being kind of a directive --

A   It's --

Q   -- to enforcing this type of a policy?

A   Yeah, it's not comp driven. Maybe I misspoke there. It's not comp driven at all. It would be more job function driven. And I think that the more front-line people -- the more front-line people are going to have a lot more flexibility than the more senior management. So it's not comp. That's a misnomer. I think that it's someone who is front line, someone who is a, you know,

employee selling stuff in our stores, installing FiOS, our -- you know, our general employees who aren't in more senior management. We're going to treat them more permissively than we would, say, somebody at my rank or higher. So somebody at the director level, VPs or CEO, they're going to be treated with a lot more restrictions at a higher level, where we try not to restrict employees really at all if we can avoid it at those levels.

Q    Okay.

A    And it's a function of risk. There's just less risk down there.

Q    What if you had, like, a -- you know, an internet installer, a fiber installer, you know, who's making, you know, 25 bucks an hour for Verizon, you know, trying to pick up a second job doing the same thing for, you know, Ziply Fiber here in Washington? Would Verizon take an issue with that?

A    Again, I think it would depend. I think we would have concerns how we would -- you know, would we allow this person to do it? I think it's going to depend on geography. I think it's going to depend on a bunch of factors, but I'll tell you though, like -- and it gets to the same thing as a front-line salesperson -- scheduling, you know, it becomes a scheduling factor. It becomes this person will have exposure to certain proprietary

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026

Page 80

network information much more than -- even a front-line installer is going to know more about our network and how it operates and the security aspects of it than someone who's selling, you know, phones in one of our stores.

So would we have -- would we have concerns about it? Yes. Would it -- would we approach it with some skepticism? Probably. Is it an absolute no? No. It is not -- let me be clear on that. It is not an absolute no, but I think that we would have to look at it very, very closely.

Q  What if there's no scheduling issues and the employee agrees to follow Verizon's confidentiality policy?

A  Yeah, again, I think that if someone is working -- it's not so much working the same job. That's not the problem. It's what is the -- what is the actual risk. So if you have somebody who is installing -- our people who install FiOS also sell, so, you know, if you go to somebody's house and install -- if you, as a Verizon employee, go to someone's house and install FiOS, you can upsell. You can -- you know, you can get commissions. So everybody sells to some degree.

I'm not sure that one of our competitors would really be interested in hiring one of our folks. I think it's a little theoretical. I just -- in all honesty, I think they would have the same problem that we do. I

Class Cert. 71

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026

Page 81

think if you were to have this discussion with AT&T or Comcast or T-Mobile, you would probably get the same response, which is we would be really skeptical, just as a practical matter, of hiring this person in the first place, so, like, unlikely, but as far as us saying no to them, again, I think it would be a hard sell. It's not an absolute no. There is always a set of facts where we could be convinced that the risk isn't necessarily -- that the risk isn't necessarily too high, but I think there would be again a lot of skepticism with that type of request.

Q  Does Verizon have any agreements with its competitors not to employ each other's employees?

A  I hope not. I don't -- I don't think that we get into any kind of agreements like that. I couldn't speak on that for sure, but I would -- I would think that would be problematic.

What I would say is that I think it's a matter of -- practically speaking, my deep suspicion is that they would -- they would -- they would approach this with deep suspicion as well, this type of arrangement.

Q  All right. Let me drop another exhibit into the chat, and then I will share it.

(Exhibit No. 5 marked for identification.)

I've already got 5 in here.  All right.  Cool.

All right.  So this is Exhibit 5.  Let me go to the top here.  This is Bates stamped Cellco_Hitch002485 all the way through 2603.  It's 119 pages.  And kind of like the last couple, I'm not going to talk about everything, but if you want to go through it all, we certainly can.

A    No.  I'm familiar with it.

Q    Cool.

Is this the Part A that you mentioned earlier?

A    This is the Part A, yeah.

Q    Okay.

A    It's not officially known as Part A.  We refer to it as -- A is general code of conduct training; B is privacy and information security.

Q    Got it.

All right.  Let me cut to the chase.  Let me go down to Page 30 here.  It's Bates stamped 2514.

So this is kind of another one of those scenarios like the two that we just looked at.

A    Yep.

Q    Why don't you take a second to read it.  Let me zoom in for you.

A    Okay.

Q    Cool.

All right.  So this is 3.6, "Outside Employment

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco -  May 20, 2026

Page 87

scenario 1 MCMA."  This one is about a person named Himari.  It's called "Himari's good deeds."

And I'll read it just for the record.  It says: "Himari, a Verizon engineer, spends her free time working with a reputable nonprofit organization mentoring students in STEM fields.  Knowing her background in cloud security, the organization asked Himari to also consult on how to best keep their system secure.  They also offer her a stipend as a thank you for the extra time she'll be putting in."

Then the question posed is, you know:  "How should Himari respond?"

And it indicates to me here, this X, that the correct answer is:  "Tell the organization that it may be possible for her to consult, but she'll need to first check with Verizon Ethics about it, as well as the stipend."

And that kind of comports with, you know, what you're telling me here today, which is cool, but I guess my question is less so with the answer and more so with the explanation that's provided.

In kind of this summary of it, it says, you know: "Himari's good deeds," and it says:  "This is a good rule to follow in general:  Think carefully and contact Verizon Ethics if your outside work could have anything

Class Cert. 74

to do with Verizon or any of its offerings."

The part I'm just curious about is the next paragraph.  If you wouldn't mind just reading it for me.

A    Sure.

"Verizon does not allow employees to have side gigs that compete with products or services offered by Verizon -- whether the work is paid or unpaid.  And while a particular job may not appear to compete with Verizon, the company is engaged in a variety of markets including finance and healthcare, so it's best to check with us before taking any outside job.  Verizon Ethics will help work" -- "will help you work through whether your activities conflict with something Verizon does or is planning to do."

Q    And is --

A    And --

Q    Go ahead.

A    No.  Go ahead.

Q    I just want to touch on this.

You know, why is Verizon telling employees that they -- that Verizon does not allow employees to have side gigs that compete with products or services offered by Verizon whether the work is paid or unpaid?  Why is Verizon saying that?

A    Well, I think what we're doing is we're getting our

employee's take about what exactly a conflict is.  We don't want our employees having a gig that is directly competitive with us.

So if your job -- again, I hate to keep using the expression, but case by case.  The -- if your side gig is going to compete with us directly in either -- if your side gig is going to offer products or services, facilitate the offering of products or services by a competitor, and you're in a position to raise the risk that could hurt us or our customers, we are going to take a very skeptical view on that, so that's why we say, you know, "While this may not appear to compete with Verizon, we have a ton of stuff out there.  Let's work through stuff.  Let's work through this."

And we even say underneath, you know:  "We get it.  It isn't easy to thread the needle.  Don't hesitate to reach out to us -- we're happy to work through it with you.  We consider it time well spent."

This the invitation for employees to reach out and have these discussions.  It's not a general prohibition.  It is not a thou shall not.  It's, hey, you know, side gigs are something where if you're directly competing with us, we're very possibly going to have a problem with it, but let's talk through it.  It doesn't mean you can't do it.  It doesn't mean you can't have that side gig.  It

Class Cert. 76

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026

Page 90

means that we may have to -- if you do do it, you may have to have -- there may have to be controls in place.

So, you know, we might not allow you to just have cart blanche, but it might be that, you know, if you're going to engage in the side work, you can't sell or you can't be in a certain geography, or whatever -- you know, whatever makes sense based on the specific facts.

Q  I guess -- and I guess we kind of keep coming back to this. Why include this, you know, equivocal language "does not allow"? Like, why would you include that here if your guy's -- if Verizon's intention is just to spark a conversation? Why not omit all of that and just say, "Come talk to ethics. Let's figure it out together"?

A  Yeah, I mean -- and I think that is our general view. If you look at the training as a whole, they're referring here as "Come talk to us."

The point of this is to get down into specific scenarios and talk about where things would be a highly -- where we would be -- where we would be skeptical. And I think something like this, we are directly competitive. If -- you know, if something is directly competitive -- and Himari might not be directly competitive, and that's the whole point. The way this is written, it's written to be ambiguous enough where, hey, it could -- he could be directly competitive with us and

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026

Page 91

that probably wouldn't be allowed versus, you know, he might not be. He might just think in his mind, oh, they're never going to -- they're never going to approve this. This is competitive. We might say yes -- yes, it is. So we want people to come have that conversation with us. That's why we have that refrain.

But at the same time, we want to make it clear to people, like, there is an expectation that you're not going to get yourself or the company involved in a conflict. Otherwise, we're just -- you know, what's the point in training at all if you just -- you know, I think our view on this is making sure that people realize it's tough for us to approve something when we're on both sides of the transaction. If the specific facts of your situation are going to put you on both sides of the transaction, it's going to create actual, not just theoretical harm or theoretical risk.

Q    Okay. I mean, do you see an issue with telling an employee that they're not allowed to have a side gig that competes with the company and then telling them that they're subject to discipline up to and termination if they violate that policy, and then kind of using this throwaway line about, you know, "But come talk to us"? Don't you see how that could scare an employee?

MR. NELSON: Object to the form.

better over by us," or, "Hey, Verizon's got more inventory of the newest -- the newest phone that's out." You know, it becomes really hard -- again, that's where -- that's where it's case by case, and we have to -- we have to evaluate it.

We don't want AT&T thinking that we are colluding with their employees. We don't want the government thinking that we're colluding with their employee because we're not. We don't want sharing customer information because that's just not something we do for our own customer security and our reputation.

So I think that these types of situations would be viewed a direct conflict with a lot of skepticism, but again, it's a controls discussion. It's not -- there is no absolute no until we -- until somebody comes to us and has a discussion and we get to -- we get to flesh it out.

Q   Okay.  Let me drop another exhibit in here.

(Exhibit No. 6 marked for identification.)

Q   (By Mr. Cipriani) All right.  I dropped in the chat what is Exhibit 6, although it's labeled Exhibit 7.  Sorry about that.

Let me share my screen.

A   Okay.  I see it's code of conduct training.

Q   Yeah.  "Integrity Always Matters VZ155317."

This document is Bates stamped Cellco_Hitch002899 through 2927.

Are you familiar with this training?

A    I am.

Q    How does this differ from the other two that we looked at?

A    This is either -- I think this may have been a weightier iteration of the one we just looked at.

Q    Okay. And this number at the end, VZ155317, what does that indicate, if anything at all?

A    Our learning and development just has that just like some case management as a case ID number. I believe that's just the unique identifier for the training.

Q    Okay. So on Page 3 here, it says -- kind of right in the middle here, it says: "Welcome to the second episode of Verizon's new, shorter Code of Conduct training." And then it says: "Last quarter we focused on Integrity Under Pressure..." and "This quarter's theme is a familiar one: Integrity Always Matters."

Is the -- and forgive me if we touched on this. Is this saying that Verizon employees do quarterly trainings?

A    So we've switched over in the past year to -- instead of these long 45-minute trainings, we've switched over to quarterly training, where it's kind of hitting snippets.

So we -- instead of covering conflicts every time -- there's no need to cover conflicts of interest four times a year, so we -- you know, we might pick conflicts, one, gifts and entertainment, another, and what we've also done over the past year is integrated some of the privacy and information security into that.  So it's three 15-minute -- Q1, Q2, and Q4 -- three 15-minute trainings, and then Q3 is an integrity survey where employees can answer questions.  It's not an actual training as much as it is a survey.

Q    Okay.

A    But it's the same thing just broken up over the course of the year.

Q    Got it.

All right.  Let me skip to Page 20, I believe.  Sorry.  Twenty -- here we go.  So this one is Bates stamped Cellco_Hitch002918.  I'm looking at the "Section 3.4 Focus Key Points."

A    Okay.

Q    Can you just read this slide starting with "As V Teamer" -- "As V Teamers..."

A    Sure.  "As V Teamers we focus on what's best for Verizon and our customers.  That means we avoid conflicts of interest and we sell with integrity.  We never:  Hire or supervise close friends or family members; Do not [sic]

Class Cert. 81

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026

Page 101

work for Verizon's competitors while employed by Verizon; Trade securities based on confidential information we know as a result of our jobs; and Solicit colleagues or vendors to support our personal charities."

Q    That second bullet point, "We never do work for Verizon's competitors while employed by Verizon," why is this such a clear prohibition on working for competitors?

A    Yeah, again, I think in the context of the greater training. And I think as you look here, we're -- and again, I'd have to look at the context more of what's before and what's after, but the way we set up a training here is to sensitize people to what we would consider problematic, and a direct conflict might be problematic and something we have to address.

So again, like, if you were to go to the end of this training, go to the beginning of this training, go throughout this training, you're going to see "By the way, reach out to Verizon Ethics" on all of this stuff. You're going to see "Reach out to us." You know, "Don't hesitate" or "Your friendly helper is here to talk this stuff through with you."

So yeah, we're hitting quickly -- because again, this was a -- somewhat of a condensed training here. We're hitting this training. And I think this was a very recent training. You know, we're just basically saying

Class Cert. 82

to people this is something you should be sensitive of, this is something that's discussed in our code of conduct, but we have to have a conversation about it. That's the way the training -- the whole training is set up.

Q  Okay. But, I mean, you can concede that it doesn't say "Come chat" in this particular slide?

A  In that slide it does -- it does not, no.

Q  Okay.

A  But it does say we avoid conflicts of interest and sell with integrity.

You know, I think again it's not that same categorical yes. The language in those bullet points is a little bit on the stronger side of what we've trained on, but again, taken in the context of the broader training, the intro to training, the end of the training, you will see where it says, "Reach out to Verizon Ethics to discuss any of this stuff."

And for instance, though, I think it's worth noting I've never -- I've never -- no. We can leave it there.

Q  Okay. Excuse me. It is allergy season.

A  No, I get it. My black car is yellow.

Q  As is my white car.

All right. Let me upload another exhibit here.

A  Sure.

(Exhibit No. 7 marked for

identification.)

Q   (By Mr. Cipriani)  All right.  And again, since we --
since I skipped one, the numbering is off by one, so this
is Exhibit 7, not Exhibit 8.  I'm going to zoom in.

Oh, I'm not sharing.  Here we go.

All right.  Hopefully you can see my share screen
again.

A   I can.

Q   Cool.  All right.  So this is Bates stamped -- this is
very small -- Cellco_Hitch002350 through 2351.

Okay.  Are you familiar with this document?

A   I've seen it before.  It is not a -- it is not a
compliance or ethics document.  I believe this may either
be HR -- I think this is HR.

Q   Okay.  And before we kind of dive into the -- I guess the
substantive contents of it, I guess I'm just more
curious.

So this looks like a screen grab or, like, a print
to PDF of, like, a web page --

A   Yeah.

Q   -- from Inside Verizon.

Forgive me if we've talked about this already, but
what's Inside Verizon?

A   That's our internal intranet page, so all employees have

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026

Page 104

access to it.  Codes of conduct are there.  It's basically -- it's the internal landing page with a search function.  So you could go to your benefits.  You could get the code of conduct.  You could get certain guidelines.  You know, anything you need purely from an HR perspective would be here as well.

Q  Okay.  Is this where they complete the trainings?

A  You have a link to the trainings.  You could link to the trainings from a reminder bot on there.  So yes, I believe the trainings are actually completed in a system called Workday, which is owned by the HR organization. The relationship with them -- with Workday is owned by the HR organization, but Workday is a large third-party vendor, but it's accessed through Inside Verizon.

Q  And I don't know if you can see my cursor, but under the Standards of Conduct in the top-ish left --

A  Yep.

Q  -- it looks like a file path; right?  It says "Inside Verizon" to "HR Guidelines" to "LifeAndTimeOff" to "WorkplaceEnvironment" to "Standards of Conduct."

A  Yep.

Q  My question is on the second kind of level of the file path, "HR Guidelines."

A  Mm-hm.

Q  Is this just a link to the code of conduct, or is it

something else?

A    I believe that might be a link to some of our -- so we do have a separate policy.  It does not address codes of -- it does not address conflicts of interest or a lot of the issues addressed in the code, but it's standards of office behavior -- you know, don't touch people; don't scream at people -- basic HR guidelines in that way.

It's not the -- you know, sales practices aren't there.  Conflicts of interest, gifts and entertainment, those types of questions aren't there.  There's no redundancy on the major code issues with what would be in HR guidelines.  That's more of an operational nuts and bolts along with "Don't touch people."

Q    Got it.

The substance of this scout's honor policy -- so there's a large blank space, and then it says "Conduct Violations," and then there's a bunch of bullet points.

It says:  "Types of behavior and conduct violations that may result in immediate corrective action, up to and including termination of employment, include but are not limited to."  Then it has all sorts of things a presumed employee shouldn't do, and the third from the bottom of this first page says:  "Violation of the Verizon Code of Conduct."

Is that just reiterating that, you know, if Verizon

deems it necessary, they can discipline, you know, or terminate an employee for violating anything in the code?

A   Yes.   I think -- let me think.   What this is doing is saying that after -- after a matter has been looked into, if an employee is deemed to have engaged in conduct that is incompatible with Verizon culturally, legally, from a code of conduct perspective in a way that is serious enough, discipline can follow; that discipline could include termination.

This language here, the may, "may result in immediate corrective action," doesn't necessarily mean it will.   It just depends on circumstances.

Q   Okay.

A   I think HR here is just doing a general cover -- you know, cover all of their bases to make sure employees are on notice.   Like, you have the ball.

Q   Are you or your team, are you guys ever involved in the actual discipline side of things?

A   So it depends.   If it's a code -- if it's a code violation, we were involved.

So my team has a sister team called Verizon Investigations.   It used to be -- we all report to Steve Helvin, who is my immediate boss, and we work with investigations.   We do some investigations ourselves, but largely these days that's outsourced to our sister team.

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco -  May 20, 2026

Page 107

We do have a seat at the table.  We are not the determiners of who -- you know, of discipline.  Discipline determinations are made by the business with HR.  We are the finders of fact.  So ethics and investigations is the finder of fact.  We have a seat at the table, but it's a broader discussion between the business, HR, employment law, and our organization.

Q  Okay.  Do you make recommendations to the HR side of the house on what level of discipline to dish out?

A  It is -- it's a conversation.  It's not that we make a recommendation.  We have factual findings, and then from the factual findings we talk about it.  There are peer organizations.  No one is jamming a determination down anybody's throat.  It's we sit down, figure out -- you know, we put the facts on the table and then figure out what an appropriate response would be.

Q  Okay.

A  And that's from -- everything from the least serious to the most serious matters.

   And there's plenty of space, you know.  Sometimes people don't realize they're engaged in misconduct.  So, you know, it gets -- it really drills down into the facts of, you know, was something intentional, was it very clearly unintentional.  There is a lot of factors that come into play here.

Class Cert. 88

I think the driver here has always been, look, you don't sell phones by having an employee population that's afraid of you.  You don't drive revenue by being an overly oppressive compliance regime.  I think you -- you know, you try to be as fair as you can so that your employees can do what they can do without looking over their shoulder.  So that's the messaging.  When it comes to employee discipline, we want to be known as -- you know, as the orgs that treat people fairly but that when something -- when -- you know, when something does go seriously wrong, there are consequences or there may be consequences.

Q   I scrolled down to the second page while you were giving your answer, and it says:  "Corrective Action."  "Termination of employment is very often warranted for conduct violations.  Corrective action for conduct violations, however, can be based on many factors and may range from counseling to immediate termination of employment.  Progressive corrective action steps are generally not applied to conduct violations because of the serious nature of such violations and because further incidents will not be tolerated."

Is this just kind of a catchall saying, hey, you know, sure we can go down the corrective action, but, you know, if you're violating one of the policies in the

code, we can fire you without doing an additional investigation?

A    No.  People aren't fired without investigation.  That's just categorically not true.  So after an investigation, after a finding of fact, what we're saying here is you can -- if there was -- you know, if it's warranted, you can be fired.  So termination is often warranted for conduct violations.

If somebody is stealing, if somebody's, you know, engaged in cyber trading, if somebody's doing, you know -- you know, committing fraud or slamming or cramming our customers, if someone's accessing customer information to steal an identity, like, yeah, there's going to be serious consequences.  It doesn't say always.  It says very often warranted for conduct violations, meaning, yeah, we have to unfortunately do it sometimes.  It doesn't say that this happens every time.

There's plenty of findings of misconduct where we just say, "Please don't do that again."  Like, "This was a problem.  Don't do it again."  We don't formally do anything to tarnish their record.

I think that the -- I've been here for eight and a half years.  The company's approach on this is we want to make sure that employees know they have to follow the rules and abide by our culture, but at the same time we

Hitch, et al. vs Cellco Partnership, et al.
Cellco Partnership 30(b)(6), Cellco - May 20, 2026

Page 110

never want to be heavy-handed.

Q   Okay.  And I know we talked about this kind of at the start of this whole thing, but it sounds like you've done, you know, several, if not a whole lot more than several investigations into alleged conflicts of interest.

Is that fair to say?

A   Hundreds.

MR. NELSON:  Object to the scope.

A   In Washington -- here's what I'll say.  In my career I've done hundreds of investigations into conflicts of interest.  When it comes to state of Washington, I can not recall a single investigation into a conflict of interest, and I specifically cannot recall a single instance where I've engaged in a conflict of interest with respect to outside employment, not one.

Q   (By Mr. Cipriani)  And I know you say you cannot specifically recall.  I mean, can you say that's true to 100 percent certainty?

A   Actually, as certain as anybody could testify.

Q   Okay.  Have you ever disciplined an employee for a conflict of interest in Washington?

A   In terms of employment or outside employment, I can't recall a single case.  I'm not saying that that hasn't happened, but in the six and a half years that I've been

in this role and the two years before that where I was serving as the lawyer for this team, I can't recall a single incident in the employment context.

Conflict of interest -- look, we don't have a huge employee population in the state of Washington.  I can't recall -- and generally I have a pretty good recollection of these things.  I can't recall disciplining anyone for a conflict of interest issue even in general in the state of Washington in recent memory.

Q  Okay.  All right.  And if you had, it would be in the -- I think you called them the investigation files, when the reporter initiates it through one of those -- I think you said -- five different channels; right?

A  Yeah.  So we would -- we would know -- we would be able to look and see.  And, you know, I've looked at our system, and I haven't seen anything.

My -- my -- I would be aware of any serious violations because my team would talk to me about it.  Like, this is the type of thing.  If there was going to be an investigation into some type of misconduct where we were going to discipline somebody over a conflict, I would have a -- I would have a seat at that table.

Washington is again a spun-off employee population and not on my radar every day just because, you know, our general business is East Coast south, you know.  I

would -- I would remember something that happened in Washington if something went wrong there, and there's absolutely nothing, and I could say that with a great degree of certainty.

Q   What type of authority do, you know, store managers have to, you know, dish out authority on policy violations?

A   Almost none.

Q   Okay.

A   Almost none.  Everybody in the company is directed -- and this goes for our own lawyers, not just our front-line store people.  It's no one can officially opine on the code of conduct.  Somebody -- you know, a manager might say, just like in any work setting, "Now, this might be a problem," or, "You know, I've been around for 20 years, and I could kind of see how they might handle something," but official guidance doesn't come from your manager.

Waivers, especially conflicts of interest, don't come from your manager.  They don't come from HR.  They don't come from legal.  There's only one place.  When it comes to conflicts of interest that are brought up by our leader- -- our very senior leadership, including people in my own management chain, they come to our group.  So anybody, including the most senior legal executives, they will come to us for conflict of interest issues, and then from there we will opine on them, And that's because, you

B&A LITIGATION SERVICES

know, our org also reports to the board of directors, so there's independent oversight for our own leadership there.

Q    And you said waivers.  Has Verizon ever issued a conflict of interest waiver in Washington?

A    Yes, certainly.  And I wouldn't even call it a waiver. It's just a matter of -- it's not that we waive conflicts of interest.  It's that we will mitigate the risks with them by implementing controls.  So there are instances where we've said, sure, something might be a conflict, but let's put some controls into place.

And, you know, I had mentioned a couple cases earlier, and there's a handful of matters where we were able to either say, look, something on the surface wasn't enough of a conflict to cause us an issue, or we were able to put controls into place, but in the state of Washington, again I have no -- no record that I'm aware of and no personal knowledge -- and I've been in this role for a long time -- of saying blanket no to anybody.

Q    And when you say "controls," can you give me some examples?

A    It could be -- it could be something as simple as, you know -- let's say you're in the -- we could -- if you're an enterprise salesperson who's selling to businesses, we could say, okay, you're selling in one space.  You're

selling to aerospace for Verizon.  We don't want you selling for aerospace at AT&T, or we don't want you selling into the same channels that you sell at for us.

So that's just an example.  I mean, that's not a concrete example.  That's just what's coming -- what's coming to my mind.  We could limit people by geography and say, look, we don't have a store in this county.  Sure, go to another county.  There's very little risk of a front-line salesperson -- and again, that's not a specific, but that's the type of control that we would implement.  So it could be geography; it could be type of product sold; it could be what you're doing for them.

I think one of the biggest asks that we get -- one of the biggest requests that we get is, hey, I want to work for -- I want to work for a competitor.  I want to work for a competitor but doing something completely different.  And we shrug our shoulders, you know, at something like that, whether it's in Washington or somewhere else.

And I say one of the most common.  We don't get many of them, but when we -- in the state of Washington, but when we do, I think it's largely just -- largely been okay because we were able to be comfortable enough that the risk was low, which is why again I don't have a single case in the better part of a decade where we've

STATE OF WASHINGTON )      I, Valerie L. Torgerson, CCR, RPR,
                    ) ss a certified court reporter
County of Pierce    )      in the State of Washington, do
                           hereby certify:

        That the foregoing deposition of GLEN SPROVIERO was taken before me and completed on May 20, 2026, and thereafter was transcribed under my direction; that the deposition is a full, true and complete transcript of the testimony of said witness, including all questions, answers, objections, motions and exceptions;

        That the witness, before examination, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth, and that the witness reserved the right of signature;

        That I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel and that I am not financially interested in the said action or the outcome thereof;

        That I am herewith securely sealing the said deposition and promptly delivering the same to Paul Cipriani, Jr.

        IN WITNESS WHEREOF, I have hereunto set my signature on the 25th day of May 2026.

                                    _____
                                    /s/Valerie L. Torgerson, CCR, RPR
                                    Certified Court Reporter No. 2036
                                    (Certification expires 9/3/2026.)

# EXHIBIT B

# Integrity is at the core of who we are.

## Code of Conduct



**2021**

CONFIDENTIAL

Cellco_Hitch002353
Class Cert. 98

# A letter from Hans

## Hello V Team,

Trust and transparency are the bedrock of any business. At Verizon, we conduct our work at the highest level of operational excellence with integrity and accountability as core values baked into the very fabric of our culture and Credo.

Guiding our operations, processes and behaviors is a Code of Conduct that reinforces how we must manage our relationships and business. It provides a framework to gauge when we need to seek guidance on ethical dilemmas and what to do when faced with compliance concerns. Most of all, it's a moral compass that lifts up our Purpose so that we can continue to move the world forward.

Everyone has a role to play in making sure we hold ourselves to the highest ethical standards and integrity in our work. At times, that may mean making some tough decisions, but to remain at the forefront of the industry means we lead by example with our values guiding us forward.

Please review our Code of Conduct and seek guidance if you have any questions or concerns. Being part of the V Team means we have the honor of serving our customers and communities who trust us and are counting on us to do right by them. It's important to not only understand our values but put them into practice by living them every day.

Together, we will continue to grow and elevate our standards to make our company even greater than it is today. And we will do it the right way — the V Team way.

#ForwardTogether

Hans



CONFIDENTIAL

Cellco_Hitch002355

Class Cert. 99

# Introduction[1]

**My manager is directing me to violate the expense policy. I am concerned that she will retaliate against me if I report her. What do I do?**
You should report the manager's misconduct. Retaliation against employees who report concerns is strictly prohibited, and if you have concerns about retaliation, you must report those as well. In addition, you have the option of making an anonymous report to Verizon Ethics.

We are defined by our values: integrity, respect, performance excellence, accountability, and social responsibility. These values should guide us in how we deal with every problem at work, large and small. The Code of Conduct gives us detailed guidance about how to apply Verizon's values to specific issues and challenges that arise in our jobs. It reflects our changing business environment and has been approved by the Verizon Board of Directors.

You must follow the law, the Code of Conduct, and all Verizon policies and guidelines. You can't violate any of these rules for any reason, even if you are instructed to do so by a supervisor. Violations of this Code, or any other Verizon policy, can lead to discipline up to and including termination of employment.

But following the Code of Conduct is just a starting point. We're all expected to help maintain and promote the culture of integrity that is one of Verizon's greatest competitive advantages. A critical part of maintaining a culture of integrity is making sure that each of us asks questions and raises concerns. If you do this, you can help the company spot issues before they turn into problems. Reporting misconduct or ethics concerns isn't just an option – it's each employee's responsibility. You must report suspected misconduct and violations of the Code.

Employees in supervisory roles have a special duty to set the right example.  Supervisors must promote an open door culture in which employees are comfortable speaking their mind.  Verizon prohibits retaliation against employees for submitting complaints or cooperating with investigations, and anyone engaging in retaliation is subject to discipline, up to and including termination of employment. If you believe that you or anyone else is the subject of retaliation for reporting misconduct or cooperating with an investigation, you must report it to the Legal Department, Verizon Ethics, or Human Resources.

If your local laws conflict with the Code of Conduct or your business unit has more restrictive policies or practices, you must comply with the local law or the unit's policy or practice.

## Where to report

You have an array of resources to assist you should you have any concerns or questions about how the Code applies to a particular issue. Verizon Ethics is available 24 hours a day, 7 days a week at 844-894-8433, verizonethics.com, or ethics@verizon.com.  You can make anonymous reports to Verizon Ethics, and you can contact Verizon Ethics either to report misconduct or just to ask a question about the Code of Conduct or company policy. A complete list of available resources is available at the end of the Code of Conduct.

You must immediately report any instance of violence, hostile behavior, or possession of weapons on company property to Security and a supervisor. In cases of imminent danger,

Cellco_Hitch002358
Class Cert. 100

you should contact 911 or local law enforcement first, and then contact Security at 800-997-3287 (US) or 972-615-4343 (International).

You must report any concerns or questions you have about the accuracy or integrity of Verizon's financial statements, reporting, accounting, internal accounting controls, or auditing matters to Internal Audit at accountingcomplaints@verizon.com or to Verizon Ethics.

**I work in a store, and a police officer came into the store to demand records about a customer. What should I do?**
You should refer any requests from law enforcement to Security or the Legal Department immediately. Additional information about the handling of external requests is available on page 23 and contact information for Security and the Legal Department is available at the end of the Code of Conduct.

## Cooperation with investigations

You must cooperate completely in any investigation. You must be honest and forthcoming at all times during an investigation, and you must provide any investigator with full, accurate, timely, and truthful information. Misrepresenting facts or failing to disclose facts during an investigation is strictly prohibited. You can't interfere with or obstruct an investigation conducted by the company or by any government agency.

[1]You are required to comply with this Code as a condition of continued employment. This Code may be changed by the company at any time, except pursuant to any applicable collective bargaining obligations, without notice to you. Except where applicable law provides otherwise, employment with Verizon is "at will," which means that you or Verizon may terminate your employment, at any time, with or without cause, with or without notice, for any reason not prohibited by law, unless governed by a collective bargaining agreement or specific contract of employment. Any at will employment relationship may not be modified except in a written agreement signed by an authorized Verizon officer.

Cellco_Hitch002359

Class Cert. 101

# Integrity and fairness in the workplace.

Our company's reputation is based on the actions of its employees. Each of us must act with integrity and respect at all times.

## Conflicts of interest

You must avoid any relationships or activity that might impair, or even appear to impair, your ability to make objective and fair decisions when performing your job. When acting on behalf of the company, you must advance the company's legitimate interests when the opportunity to do so arises. If you identify a situation where the company's interests are being harmed, you must report the matter to Verizon Ethics.

You must never use Verizon property or information for personal gain or take personal advantage of any opportunity that arises in your work for Verizon.

You must disclose any potential or actual conflict to Verizon Ethics as soon as you become aware of it.

## Personal conflicts of interest

**I am a Vice President and one of my reports disclosed a personal conflict of interest to me. I promptly implemented controls to minimize the risk. Is that sufficient?**
No. All conflicts and potential conflicts of interest must be cleared by Verizon Ethics.

Certain types of personal relationships can create actual or apparent conflicts of interest both internally at Verizon and in our interactions with third parties. Never use your position at the company to advance your personal interests or those of a friend or relative at the expense of the company's interests.

Internally, you may not supervise – directly or indirectly – someone with whom you share a close personal relationship, such as anyone in your family or household, or someone with whom you have or had a romantic relationship or other similar relationship. Even if a family member or romantic partner is not in your reporting chain, if you interact with such a person as part of your Verizon work responsibilities, you must avoid any actions at work that could create even the appearance of a conflict of interest. If you are uncertain about what interactions are appropriate, you must contact Verizon Ethics.

Externally, you may not participate in the selection process for, have discretionary authority involving Verizon's business with, or supervise Verizon's relationship with, a company that does business with Verizon if it employs someone with whom you have a close personal relationship or is a company with which you have a business relationship. Exceptions to this restriction are extremely limited and require the approval of Verizon Ethics.

Cellco_Hitch002367
Class Cert. 102

| Verizon | Code of Conduct | Integrity and fairness in the workplace. | 16 |

If a family member or person with whom you have a close personal relationship is employed by an entity that does business with Verizon, you cannot interact with that individual about business between Verizon and the outside entity.

## Outside employment

You may not—with or without compensation—be self-employed or employed by, consult with, own, perform services for, or aid:

- a company or organization (including a charitable organization) that is a vendor, supplier, partner, contractor, subcontractor, or competitor of Verizon; or
- a company that provides services that are provided by Verizon, or that Verizon is seeking to provide.

Outside work must not interfere with your work for Verizon. This limitation also applies to simultaneous employment by Verizon and its subsidiaries, affiliates, and joint ventures in which the company maintains an ownership interest. Exceptions to the requirements of the previous paragraph may be granted only upon written approval by Verizon Ethics.

Unless you receive the prior written approval of your supervisor and Human Resources, you may not engage in any outside employment or self-employment or perform any commercially-related services—with or without compensation—while absent from work on any company-approved leave of absence, absence due to sickness or disability, Family Medical Leave, or comparable leave provided for by applicable law.

## Outside activities

When employees participate in outside activities, Verizon draws a distinction between personal activities (not representing Verizon) and service on behalf of the company (representing Verizon). Many employees, in their personal capacities, participate in outside civic and charitable activities by serving as trustees or members of various community organizations such as local not-for-profits, religious institutions, parent teacher associations, or homeowners' associations. If a matter regarding Verizon's services or products arises when performing such outside civic or charitable activities, you must remove yourself from discussing or voting on the matter or on any matter that involves the interests of Verizon or its competitors to avoid conflicts of interest, such as whether your organization should select Verizon phone service, or purchase a competitor's products rather than Verizon's. Participation in outside civic or charitable activities should not interfere with your work for Verizon. To the extent your participation infringes on company time or involves the use of Verizon resources, your supervisor's approval is required.

Service in an outside organization on behalf of Verizon means that you are expected to represent Verizon's interests when participating in the organization's activities. Prior to serving as a representative of Verizon with any outside organization, you must obtain the prior approval of Verizon Ethics and your vice president level supervisor.

Special approval requirements apply when seeking to serve on any outside company's Board of Directors:

- Service on the Board of Directors of a public corporation must be approved in advance by both Verizon Ethics and your organization's executive vice president.
- Service on the Board of Directors of a non-public corporation must be approved in advance by Verizon Ethics.

---

**How do I find out if the company where I have a second job is providing services that are also provided by Verizon?**
Verizon provides a wide array of products and services. Many are obvious, including telephone, internet, and television service. However, Verizon provides many other services, and if you think there is any chance that an outside employer might be operating in the same space as Verizon, you must contact Verizon Ethics for guidance.

**My supervisor knows that I have a side job designing apps for mobile devices. Do I have to let anyone else know?**
A "side hustle" related to the field in which you work for Verizon, or involving any product or service in which Verizon might be active, must be approved by Verizon Ethics.

**I have been asked to participate in an investor expert network as a tech industry professional. This expert network does research to assist investors. If I do not reveal any confidential Verizon information, can I participate?**
Employees and executives are generally prohibited from participating in expert networks for investors due to insider trading concerns. You should consult with Verizon Ethics regarding this request.

CONFIDENTIAL

Cellco_Hitch002368
Class Cert. 103

# EXHIBIT C

Class Cert. 104

# Integrity is at the core of who we are.

## Code of Conduct



**April 2023**

Cellco_Hitch000048

# A letter from Hans

## Hello V Team,

Trust and transparency are the bedrock of any business. At Verizon, we conduct our work at the highest level of operational excellence with integrity and accountability as core values baked into the very fabric of our culture and Credo.

Guiding our operations, processes and behaviors is a Code of Conduct that reinforces how we must manage our relationships and business. It provides a framework to gauge when we need to seek guidance on ethical dilemmas and what to do when faced with compliance concerns. Most of all, it's a moral compass that lifts up our Purpose so that we can continue to move the world forward.

Everyone has a role to play in making sure we hold ourselves to the highest ethical standards and integrity in our work. At times, that may mean making some tough decisions, but to remain at the forefront of the industry means we lead by example with our values guiding us forward.

Please review our Code of Conduct and seek guidance if you have any questions or concerns. Being part of the V Team means we have the honor of serving our customers and communities who trust us and are counting on us to do right by them. It's important to not only understand our values but put them into practice by living them every day.

Together, we will continue to grow and elevate our standards to make our company even greater than it is today. And we will do it the right way — the V Team way.

#ForwardTogether

Hans



Cellco_Hitch000050

Class Cert. 106

Cellco_Hitch000050

# Introduction[1]

**My manager is directing me to violate the expense policy. I am concerned that she will retaliate against me if I report her. What do I do?**
You should report the manager's misconduct. Retaliation against employees who report concerns is strictly prohibited, and if you have concerns about retaliation, you must report those as well. In addition, you have the option of making an anonymous report to Verizon Ethics.

We are defined by our values: integrity, respect, performance excellence, accountability, and social responsibility. These values should guide us in how we deal with every problem at work, large and small. The Code of Conduct gives us detailed guidance about how to apply Verizon's values to specific issues and challenges that arise in our jobs. It reflects our changing business environment and has been approved by the Verizon Board of Directors.

You must follow the law, the Code of Conduct, and all Verizon policies and guidelines. You can't violate any of these rules for any reason, even if you are instructed to do so by a supervisor. Violations of this Code, or any other Verizon policy, can lead to discipline up to and including termination of employment.

But following the Code of Conduct is just a starting point. We're all expected to help maintain and promote the culture of integrity that is one of Verizon's greatest competitive advantages. A critical part of maintaining a culture of integrity is making sure that each of us asks questions and raises concerns. If you do this, you can help the company spot issues before they turn into problems. Reporting misconduct or ethics concerns isn't just an option – it's each employee's responsibility. You must report suspected misconduct and violations of the Code.

Employees in supervisory roles have a special duty to set the right example.  Supervisors must promote an open door culture in which employees are comfortable speaking their mind.  Verizon prohibits retaliation against employees for submitting complaints or cooperating with investigations, and anyone engaging in retaliation is subject to discipline, up to and including termination of employment. If you believe that you or anyone else is the subject of retaliation for reporting misconduct or cooperating with an investigation, you must report it to the Legal Department, Verizon Ethics, or Human Resources.

If your local laws conflict with the Code of Conduct or your business unit has more restrictive policies or practices, you must comply with the local law or the unit's policy or practice.

## Where to report

You have an array of resources to assist you should you have any concerns or questions about how the Code applies to a particular issue. Verizon Ethics is available 24 hours a day, 7 days a week at 844-894-8433, verizonethics.com, or ethics@verizon.com.  You can make anonymous reports to Verizon Ethics, and you can contact Verizon Ethics either to report misconduct or just to ask a question about the Code of Conduct or company policy. A complete list of available resources is available at the end of the Code of Conduct.

You must immediately report any instance of violence, hostile behavior, or possession of weapons on company property to Security and a supervisor. In cases of imminent danger,

Cellco_Hitch000053

Class Cert. 107

Cellco_Hitch000053

you should contact 911 or local law enforcement first, and then contact Security at 800-997-3287 (US) or 972-615-4343 (International).

You must report any concerns or questions you have about the accuracy or integrity of Verizon's financial statements, reporting, accounting, internal accounting controls, or auditing matters to Verizon Ethics.

## Cooperation with investigations

You must cooperate completely in any investigation. You must be honest and forthcoming at all times during an investigation, and you must provide any investigator with full, accurate, timely, and truthful information. Misrepresenting facts or failing to disclose facts during an investigation is strictly prohibited. You can't interfere with or obstruct an investigation conducted by the company or by any government agency.

**I work in a store, and a police officer came into the store to demand records about a customer. What should I do?**
You should refer any requests from law enforcement to Security or the Legal Department immediately. Additional information about the handling of external requests is available on page 23 and contact information for Security and the Legal Department is available at the end of the Code of Conduct.

[1]You are required to comply with this Code as a condition of continued employment. This Code may be changed by the company at any time, except pursuant to any applicable collective bargaining obligations, without notice to you. Except where applicable law provides otherwise, employment with Verizon is "at will," which means that you or Verizon may terminate your employment, at any time, with or without cause, with or without notice, for any reason not prohibited by law, unless governed by a collective bargaining agreement or specific contract of employment. Any at will employment relationship may not be modified except in a written agreement signed by an authorized Verizon officer.

Cellco_Hitch000054

Class Cert. 108

Cellco_Hitch000054

# Integrity and fairness in the workplace.

Our company's reputation is based on the actions of its employees. Each of us must act with integrity and respect at all times.

## Conflicts of interest

You must avoid any relationships or activity that might impair, or even appear to impair, your ability to make objective and fair decisions when performing your job. When acting on behalf of the company, you must advance the company's legitimate interests when the opportunity to do so arises. If you identify a situation where the company's interests are being harmed, you must report the matter to Verizon Ethics.

You must never use Verizon property or information for personal gain or take personal advantage of any opportunity that arises in your work for Verizon.

You must disclose any potential or actual conflict to Verizon Ethics as soon as you become aware of it.

## Personal conflicts of interest

Certain types of personal relationships can create actual or apparent conflicts of interest both internally at Verizon and in our interactions with third parties. Never use your position at the company to improperly advance your personal interests or those of a friend or relative.

Internally, you may not supervise – directly or indirectly – someone with whom you share a close personal relationship, such as anyone in your family or household, or someone with whom you have or had a romantic relationship or other similar relationship. Even if a family member or romantic partner is not in your reporting chain, if you interact with such a person as part of your Verizon work responsibilities, you must avoid any actions at work that could create even the appearance of a conflict of interest. If you are uncertain about what interactions are appropriate, you must contact Verizon Ethics.

Externally, you may not participate in the selection process for, have discretionary authority involving Verizon's business with, or supervise Verizon's relationship with, a company that does business with Verizon if it employs someone with whom you have a close personal relationship or is a company with which you have a business relationship. Exceptions to this restriction are extremely limited and require the approval of Verizon Ethics.

**I am a Vice President and one of my reports disclosed a personal conflict of interest to me. I promptly implemented controls to minimize the risk. Is that sufficient?**
No. All conflicts and potential conflicts of interest must be cleared by Verizon Ethics.

**I work with several vendors and wanted to introduce them to my college-age daughter, who is looking for a summer internship. She's very qualified, and would be a tremendous asset to any of the vendors. Can I ask the vendors to meet with her about an internship?**
If you work with a vendor, asking that vendor for personal favors is generally prohibited. Here, it is not okay to ask the vendor to consider one of your relatives for a position, even a summer internship. The request could create the appearance of favoritism and place inappropriate pressure on the vendor.

Cellco_Hitch000062
Class Cert. 109
Cellco_Hitch000062

If a family member or person with whom you have a close personal relationship is employed by an entity that does business with Verizon, you cannot interact with that individual about business between Verizon and the outside entity.

# Outside employment

You may not – with or without compensation – be self-employed or employed by, consult with, own, perform services for, or aid:

- a company or organization (including a charitable organization) that is a vendor, supplier, partner, contractor, subcontractor, or competitor of Verizon; or
- a company that provides services that are provided by Verizon, or that Verizon is seeking to provide.

Outside work must not interfere with your work for Verizon or have any connection to the company (for example, soliciting coworkers for business or investments). This limitation also applies to simultaneous employment by Verizon and its subsidiaries, affiliates, and joint ventures in which the company maintains an ownership interest. Exceptions to the requirements of the previous paragraph may be granted only upon written approval by Verizon Ethics.

Unless you receive the prior written approval of your supervisor and Human Resources, you may not engage in any outside employment or self-employment or perform any commercially-related services – with or without compensation – while absent from work on any company-approved leave of absence, absence due to sickness or disability, Family Medical Leave, or comparable leave provided for by applicable law.

# Outside activities

When employees participate in outside activities, Verizon draws a distinction between personal activities (not representing Verizon) and service on behalf of the company (representing Verizon). Many employees, in their personal capacities, participate in outside civic and charitable activities by serving as trustees or members of various community organizations such as local not-for-profits, religious institutions, parent teacher associations, or homeowners' associations. If a matter regarding Verizon's services or products arises when performing such outside civic or charitable activities, you must remove yourself from discussing or voting on the matter or on any matter that involves the interests of Verizon or its competitors to avoid conflicts of interest, such as whether your organization should select Verizon phone service, or purchase a competitor's products rather than Verizon's. Participation in outside civic or charitable activities should not interfere with your work for Verizon. To the extent your participation infringes on company time or involves the use of Verizon resources, your supervisor's approval is required.

Service in an outside organization on behalf of Verizon means that you are expected to represent Verizon's interests when participating in the organization's activities. Prior to serving as a representative of Verizon with any outside organization, you must obtain the prior approval of Verizon Ethics and your vice president level supervisor.

Special approval requirements apply when seeking to serve on any outside company's Board of Directors:

- Service on the Board of Directors of a public corporation must be approved in advance by both Verizon Ethics and your organization's executive vice president.
- Service on the Board of Directors of a non-public corporation must be approved in advance by Verizon Ethics.

**How do I find out if the company where I have a second job is providing services that are also provided by Verizon?**
Verizon provides a wide array of products and services. Many are obvious, including telephone, internet, and television service. However, Verizon provides many other services, and if you think there is any chance that an outside employer might be operating in the same space as Verizon, you must contact Verizon Ethics for guidance.

**My supervisor knows that I have a side job designing apps for mobile devices. Do I have to let anyone else know?**
A "side hustle" related to the field in which you work for Verizon, or involving any product or service in which Verizon might be active, must be approved by Verizon Ethics.

**I have been asked to participate in an investor expert network as a tech industry professional. This expert network does research to assist investors. If I do not reveal any confidential Verizon information, can I participate?**
Employees and executives are generally prohibited from participating in expert networks for investors due to insider trading concerns. You should consult with Verizon Ethics regarding this request.

Cellco_Hitch000063
Class Cert. 110

Cellco_Hitch000063

# EXHIBIT D

# Integrity is at the core of who we are.

## Code of Conduct



**July 2023**

CONFIDENTIAL

Cellco_Hitch002282
Class Cert. 112

# A letter from Hans

---

## Hello V Team,

Trust and transparency are the bedrock of any business. At Verizon, we conduct our work at the highest level of operational excellence with integrity and accountability as core values baked into the very fabric of our culture and Credo.

Guiding our operations, processes and behaviors is a Code of Conduct that reinforces how we must manage our relationships and business. It provides a framework to gauge when we need to seek guidance on ethical dilemmas and what to do when faced with compliance concerns. Most of all, it's a moral compass that lifts up our Purpose so that we can continue to move the world forward.

Everyone has a role to play in making sure we hold ourselves to the highest ethical standards and integrity in our work. At times, that may mean making some tough decisions, but to remain at the forefront of the industry means we lead by example with our values guiding us forward.

Please review our Code of Conduct and seek guidance if you have any questions or concerns. Being part of the V Team means we have the honor of serving our customers and communities who trust us and are counting on us to do right by them. It's important to not only understand our values but put them into practice by living them every day.

Together, we will continue to grow and elevate our standards to make our company even greater than it is today. And we will do it the right way — the V Team way.

#ForwardTogether

Hans



CONFIDENTIAL

Cellco_Hitch002284
Class Cert. 113

# Introduction[1]

**My manager is directing me to violate the expense policy. I am concerned that she will retaliate against me if I report her. What do I do?**
You should report the manager's misconduct. Retaliation against employees who report concerns is strictly prohibited, and if you have concerns about retaliation, you must report those as well. In addition, you have the option of making an anonymous report to Verizon Ethics.

We are defined by our values: integrity, respect, performance excellence, accountability, and social responsibility. These values should guide us in how we deal with every problem at work, large and small. The Code of Conduct gives us detailed guidance about how to apply Verizon's values to specific issues and challenges that arise in our jobs. It reflects our changing business environment and has been approved by the Verizon Board of Directors.

You must follow the law, the Code of Conduct, and all Verizon policies and guidelines. You can't violate any of these rules for any reason, even if you are instructed to do so by a supervisor. Violations of this Code, or any other Verizon policy, can lead to discipline up to and including termination of employment.

But following the Code of Conduct is just a starting point. We're all expected to help maintain and promote the culture of integrity that is one of Verizon's greatest competitive advantages. A critical part of maintaining a culture of integrity is making sure that each of us asks questions and raises concerns. If you do this, you can help the company spot issues before they turn into problems. Reporting misconduct or ethics concerns isn't just an option – it's each employee's responsibility. You must report suspected misconduct and violations of the Code.

Employees in supervisory roles have a special duty to set the right example.  Supervisors must promote an open door culture in which employees are comfortable speaking their mind.  Verizon prohibits retaliation against employees for submitting complaints or cooperating with investigations, and anyone engaging in retaliation is subject to discipline, up to and including termination of employment. If you believe that you or anyone else is the subject of retaliation for reporting misconduct or cooperating with an investigation, you must report it to the Legal Department, Verizon Ethics, or Human Resources.

If your local laws conflict with the Code of Conduct or your business unit has more restrictive policies or practices, you must comply with the local law or the unit's policy or practice.

## Where to report

You have an array of resources to assist you should you have any concerns or questions about how the Code applies to a particular issue. Verizon Ethics is available 24 hours a day, 7 days a week at 844-894-8433, verizonethics.com, or ethics@verizon.com.  You can make anonymous reports to Verizon Ethics, and you can contact Verizon Ethics either to report misconduct or just to ask a question about the Code of Conduct or company policy. A complete list of available resources is available at the end of the Code of Conduct.

You must immediately report any instance of violence, hostile behavior, or possession of weapons on company property to Security and a supervisor. In cases of imminent danger,

Cellco_Hitch002287
Class Cert. 114

you should contact 911 or local law enforcement first, and then contact Security at 800-997-3287 (US) or 972-615-4343 (International).

You must report any concerns or questions you have about the accuracy or integrity of Verizon's financial statements, reporting, accounting, internal accounting controls, or auditing matters to Verizon Ethics.

---

## Cooperation with investigations

You must cooperate completely in any investigation. You must be honest and forthcoming at all times during an investigation, and you must provide any investigator with full, accurate, timely, and truthful information. Misrepresenting facts or failing to disclose facts during an investigation is strictly prohibited. You can't interfere with or obstruct an investigation conducted by the company or by any government agency.

**I work in a store, and a police officer came into the store to demand records about a customer. What should I do?**
You should refer any requests from law enforcement to Security or the Legal Department immediately. Additional information about the handling of external requests is available on page 23 and contact information for Security and the Legal Department is available at the end of the Code of Conduct.

[1]You are required to comply with this Code as a condition of continued employment. This Code may be changed by the company at any time, except pursuant to any applicable collective bargaining obligations, without notice to you. Except where applicable law provides otherwise, employment with Verizon is "at will," which means that you or Verizon may terminate your employment, at any time, with or without cause, with or without notice, for any reason not prohibited by law, unless governed by a collective bargaining agreement or specific contract of employment. Any at will employment relationship may not be modified except in a written agreement signed by an authorized Verizon officer.

CONFIDENTIAL

Cellco_Hitch002288

Class Cert. 115

Verizon                                    Code of Conduct                    Integrity and fairness                    15
                                                                             in the workplace.

# Integrity and fairness in the workplace.

Our company's reputation is based on the actions of its employees. Each of us must act with integrity and respect at all times.

## Conflicts of interest

You must avoid any relationships or activity that might impair, or even appear to impair, your ability to make objective and fair decisions when performing your job. When acting on behalf of the company, you must advance the company's legitimate interests when the opportunity to do so arises. If you identify a situation where the company's interests are being harmed, you must report the matter to Verizon Ethics.

You must never use Verizon property or information for personal gain or take personal advantage of any opportunity that arises in your work for Verizon.

You must disclose any potential or actual conflict to Verizon Ethics as soon as you become aware of it.

## Personal conflicts of interest

Certain types of personal relationships can create actual or apparent conflicts of interest both internally at Verizon and in our interactions with third parties. Never use your position at the company to improperly advance your personal interests or those of a friend or relative.

Internally, you may not supervise – directly or indirectly – someone with whom you share a close personal relationship, such as anyone in your family or household, or someone with whom you have or had a romantic relationship or other similar relationship. Even if a family member or romantic partner is not in your reporting chain, if you interact with such a person as part of your Verizon work responsibilities, you must avoid any actions at work that could create even the appearance of a conflict of interest. If you are uncertain about what interactions are appropriate, you must contact Verizon Ethics.

Externally, you may not participate in the selection process for, have discretionary authority involving Verizon's business with, or supervise Verizon's relationship with, a company that does business with Verizon if it employs someone with whom you have a close personal relationship or is a company with which you have a business relationship. Exceptions to this restriction are extremely limited and require the approval of Verizon Ethics.

**I am a Vice President and one of my reports disclosed a personal conflict of interest to me. I promptly implemented controls to minimize the risk. Is that sufficient?**
No. All conflicts and potential conflicts of interest must be cleared by Verizon Ethics.

**I work with several vendors and wanted to introduce them to my college-age daughter, who is looking for a summer internship. She's very qualified, and would be a tremendous asset to any of the vendors. Can I ask the vendors to meet with her about an internship?**
If you work with a vendor, asking that vendor for personal favors is generally prohibited. Here, it is not okay to ask the vendor to consider one of your relatives for a position, even a summer internship. The request could create the appearance of favoritism and place inappropriate pressure on the vendor.

CONFIDENTIAL

Cellco_Hitch002296

Class Cert. 116

If a family member or person with whom you have a close personal relationship is employed by an entity that does business with Verizon, you cannot interact with that individual about business between Verizon and the outside entity.

## Outside employment

You may not — with or without compensation — be self-employed or employed by, consult with, own, perform services for, or aid:

- a company or organization (including a charitable organization) that is a vendor, supplier, partner, contractor, subcontractor, or competitor of Verizon; or
- a company that provides services that are provided by Verizon, or that Verizon is seeking to provide.

Outside work must not interfere with your work for Verizon or have any connection to the company (for example, soliciting coworkers for business or investments). This limitation also applies to simultaneous employment by Verizon and its subsidiaries, affiliates, and joint ventures in which the company maintains an ownership interest. Exceptions to the requirements of the previous paragraph may be granted only upon written approval by Verizon Ethics.

Unless you receive the prior written approval of your supervisor and Human Resources, you may not engage in any outside employment or self-employment or perform any commercially-related services — with or without compensation — while absent from work on any company-approved leave of absence, absence due to sickness or disability, Family Medical Leave, or comparable leave provided for by applicable law.

## Outside activities

When employees participate in outside activities, Verizon draws a distinction between personal activities (not representing Verizon) and service on behalf of the company (representing Verizon). Many employees, in their personal capacities, participate in outside civic and charitable activities by serving as trustees or members of various community organizations such as local not-for-profits, religious institutions, parent teacher associations, or homeowners' associations. If a matter regarding Verizon's services or products arises when performing such outside civic or charitable activities, you must remove yourself from discussing or voting on the matter or on any matter that involves the interests of Verizon or its competitors to avoid conflicts of interest, such as whether your organization should select Verizon phone service, or purchase a competitor's products rather than Verizon's. Participation in outside civic or charitable activities should not interfere with your work for Verizon. To the extent your participation infringes on company time or involves the use of Verizon resources, your supervisor's approval is required.

Service in an outside organization on behalf of Verizon means that you are expected to represent Verizon's interests when participating in the organization's activities. Prior to serving as a representative of Verizon with any outside organization, you must obtain the prior approval of Verizon Ethics and your vice president level supervisor.

Special approval requirements apply when seeking to serve on any outside company's Board of Directors:

- Service on the Board of Directors of a public corporation must be approved in advance by both Verizon Ethics and your organization's executive vice president.
- Service on the Board of Directors of a non-public corporation must be approved in advance by Verizon Ethics.

**How do I find out if the company where I have a second job is providing services that are also provided by Verizon?**
Verizon provides a wide array of products and services. Many are obvious, including telephone, internet, and television service. However, Verizon provides many other services, and if you think there is any chance that an outside employer might be operating in the same space as Verizon, you must contact Verizon Ethics for guidance.

**My supervisor knows that I have a side job designing apps for mobile devices. Do I have to let anyone else know?**
A "side hustle" related to the field in which you work for Verizon, or involving any product or service in which Verizon might be active, must be approved by Verizon Ethics.

**I have been asked to participate in an investor expert network as a tech industry professional. This expert network does research to assist investors.  If I do not reveal any confidential Verizon information, can I participate?**
Employees and executives are generally prohibited from participating in expert networks for investors due to insider trading concerns. You should consult with Verizon Ethics regarding this request.

CONFIDENTIAL

Cellco_Hitch002297

Class Cert. 117

# EXHIBIT E

Class Cert. 118

# Integrity is at the core of who we are.

## Code of Conduct



**October 2023**

Cellco_Hitch002315
Class Cert. 119

# A letter from Hans

## Hello V Team,

Trust and transparency are the bedrock of any business. At Verizon, we conduct our work at the highest level of operational excellence with integrity and accountability as core values baked into the very fabric of our culture and Credo.

Guiding our operations, processes and behaviors is a Code of Conduct that reinforces how we must manage our relationships and business. It provides a framework to gauge when we need to seek guidance on ethical dilemmas and what to do when faced with compliance concerns. Most of all, it's a moral compass that lifts up our Purpose so that we can continue to move the world forward.

Everyone has a role to play in making sure we hold ourselves to the highest ethical standards and integrity in our work. At times, that may mean making some tough decisions, but to remain at the forefront of the industry means we lead by example with our values guiding us forward.

Please review our Code of Conduct and seek guidance if you have any questions or concerns. Being part of the V Team means we have the honor of serving our customers and communities who trust us and are counting on us to do right by them. It's important to not only understand our values but put them into practice by living them every day.

Together, we will continue to grow and elevate our standards to make our company even greater than it is today. And we will do it the right way — the V Team way.

#ForwardTogether

Hans



Cellco_Hitch002317
Class Cert. 120

# Introduction[1]

**My manager is directing me to violate the expense policy. I am concerned that she will retaliate against me if I report her. What do I do?**
You should report the manager's misconduct. Retaliation against employees who report concerns is strictly prohibited, and if you have concerns about retaliation, you must report those as well. In addition, you have the option of making an anonymous report to Verizon Ethics.

We are defined by our values: integrity, respect, performance excellence, accountability, and social responsibility. These values should guide us in how we deal with every problem at work, large and small. The Code of Conduct gives us detailed guidance about how to apply Verizon's values to specific issues and challenges that arise in our jobs. It reflects our changing business environment and has been approved by the Verizon Board of Directors.

You must follow the law, the Code of Conduct, and all Verizon policies and guidelines. You can't violate any of these rules for any reason, even if you are instructed to do so by a supervisor. Violations of this Code, or any other Verizon policy, can lead to discipline up to and including termination of employment.

But following the Code of Conduct is just a starting point. We're all expected to help maintain and promote the culture of integrity that is one of Verizon's greatest competitive advantages. A critical part of maintaining a culture of integrity is making sure that each of us asks questions and raises concerns. If you do this, you can help the company spot issues before they turn into problems. Reporting misconduct or ethics concerns isn't just an option – it's each employee's responsibility. You must report suspected misconduct and violations of the Code.

Employees in supervisory roles have a special duty to set the right example.  Supervisors must promote an open door culture in which employees are comfortable speaking their mind.  Verizon prohibits retaliation against employees for submitting complaints or cooperating with investigations, and anyone engaging in retaliation is subject to discipline, up to and including termination of employment. If you believe that you or anyone else is the subject of retaliation for reporting misconduct or cooperating with an investigation, you must report it to the Legal Department, Verizon Ethics, or Human Resources.

If your local laws conflict with the Code of Conduct or your business unit has more restrictive policies or practices, you must comply with the local law or the unit's policy or practice.

## Where to report

You have an array of resources to assist you should you have any concerns or questions about how the Code applies to a particular issue. Verizon Ethics is available 24 hours a day, 7 days a week at 844-894-8433, verizonethics.com, or ethics@verizon.com.  You can make anonymous reports to Verizon Ethics, and you can contact Verizon Ethics either to report misconduct or just to ask a question about the Code of Conduct or company policy. A complete list of available resources is available at the end of the Code of Conduct.

You must immediately report any instance of violence, hostile behavior, or possession of weapons on company property to Security and a supervisor. In cases of imminent danger,

Cellco_Hitch002320
Class Cert. 121

you should contact 911 or local law enforcement first, and then contact Security at 800-997-3287 (US) or 972-615-4343 (International).

You must report any concerns or questions you have about the accuracy or integrity of Verizon's financial statements, reporting, accounting, internal accounting controls, or auditing matters to Verizon Ethics.

## Cooperation with investigations

You must cooperate completely in any investigation. You must be honest and forthcoming at all times during an investigation, and you must provide any investigator with full, accurate, timely, and truthful information. Misrepresenting facts or failing to disclose facts during an investigation is strictly prohibited. You can't interfere with or obstruct an investigation conducted by the company or by any government agency.

**I work in a store, and a police officer came into the store to demand records about a customer. What should I do?**
You should refer any requests from law enforcement to Security or the Legal Department immediately. Additional information about the handling of external requests is available on page 23 and contact information for Security and the Legal Department is available at the end of the Code of Conduct.

[1]You are required to comply with this Code as a condition of continued employment. This Code may be changed by the company at any time, except pursuant to any applicable collective bargaining obligations, without notice to you. Except where applicable law provides otherwise, employment with Verizon is "at will," which means that you or Verizon may terminate your employment, at any time, with or without cause, with or without notice, for any reason not prohibited by law, unless governed by a collective bargaining agreement or specific contract of employment. Any at will employment relationship may not be modified except in a written agreement signed by an authorized Verizon officer.

CONFIDENTIAL

Cellco_Hitch002321
Class Cert. 122

# Integrity and fairness in the workplace.

Our company's reputation is based on the actions of its employees. Each of us must act with integrity and respect at all times.

## Conflicts of interest

You must avoid any relationships or activity that might impair, or even appear to impair, your ability to make objective and fair decisions when performing your job. When acting on behalf of the company, you must advance the company's legitimate interests when the opportunity to do so arises. If you identify a situation where the company's interests are being harmed, you must report the matter to Verizon Ethics.

You must never use Verizon property or information for personal gain or take personal advantage of any opportunity that arises in your work for Verizon.

You must disclose any potential or actual conflict to Verizon Ethics as soon as you become aware of it.

## Personal conflicts of interest

Certain types of personal relationships can create actual or apparent conflicts of interest both internally at Verizon and in our interactions with third parties. Never use your position at the company to improperly advance your personal interests or those of a friend or relative.

Internally, you may not supervise – directly or indirectly – someone with whom you share a close personal relationship, such as anyone in your family or household, or someone with whom you have or had a romantic relationship or other similar relationship. Even if a family member or romantic partner is not in your reporting chain, if you interact with such a person as part of your Verizon work responsibilities, you must avoid any actions at work that could create even the appearance of a conflict of interest. If you are uncertain about what interactions are appropriate, you must contact Verizon Ethics.

Externally, you may not participate in the selection process for, have discretionary authority involving Verizon's business with, or supervise Verizon's relationship with, a company that does business with Verizon if it employs someone with whom you have a close personal relationship or is a company with which you have a business relationship. Exceptions to this restriction are extremely limited and require the approval of Verizon Ethics.

**I am a Vice President and one of my reports disclosed a personal conflict of interest to me. I promptly implemented controls to minimize the risk. Is that sufficient?**
No. All conflicts and potential conflicts of interest must be cleared by Verizon Ethics.

**I work with several vendors and wanted to introduce them to my college-age daughter, who is looking for a summer internship. She's very qualified, and would be a tremendous asset to any of the vendors. Can I ask the vendors to meet with her about an internship?**
If you work with a vendor, asking that vendor for personal favors is generally prohibited. Here, it is not okay to ask the vendor to consider one of your relatives for a position, even a summer internship. The request could create the appearance of favoritism and place inappropriate pressure on the vendor.

Cellco_Hitch002329
Class Cert. 123

Verizon                                          Code of Conduct                              Integrity and fairness                        16
                                                                                             in the workplace.

If a family member or person with whom you have a close personal relationship is employed by an entity that does business with Verizon, you cannot interact with that individual about business between Verizon and the outside entity.

## Outside employment

You may not — with or without compensation — be self-employed or employed by, consult with, own, perform services for, or aid:

**How do I find out if the company where I have a second job is providing services that are also provided by Verizon?**
Verizon provides a wide array of products and services. Many are obvious, including telephone, internet, and television service. However, Verizon provides many other services, and if you think there is any chance that an outside employer might be operating in the same space as Verizon, you must contact Verizon Ethics for guidance.

- a company or organization (including a charitable organization) that is a vendor, supplier, partner, contractor, subcontractor, or competitor of Verizon; or
- a company that provides services that are provided by Verizon, or that Verizon is seeking to provide.

Outside work must not interfere with your work for Verizon or have any connection to the company (for example, soliciting coworkers for business or investments). This limitation also applies to simultaneous employment by Verizon and its subsidiaries, affiliates, and joint ventures in which the company maintains an ownership interest. Exceptions to the requirements of the previous paragraph may be granted only upon written approval by Verizon Ethics.

**My supervisor knows that I have a side job designing apps for mobile devices. Do I have to let anyone else know?**
A "side hustle" related to the field in which you work for Verizon, or involving any product or service in which Verizon might be active, must be approved by Verizon Ethics.

Unless you receive the prior written approval of your supervisor and Human Resources, you may not engage in any outside employment or self-employment or perform any commercially-related services — with or without compensation — while absent from work on any company-approved leave of absence, absence due to sickness or disability, Family Medical Leave, or comparable leave provided for by applicable law.

## Outside activities

When employees participate in outside activities, Verizon draws a distinction between personal activities (not representing Verizon) and service on behalf of the company (representing Verizon). Many employees, in their personal capacities, participate in outside civic and charitable activities by serving as trustees or members of various community organizations such as local not-for-profits, religious institutions, parent teacher associations, or homeowners' associations. If a matter regarding Verizon's services or products arises when performing such outside civic or charitable activities, you must remove yourself from discussing or voting on the matter or on any matter that involves the interests of Verizon or its competitors to avoid conflicts of interest, such as whether your organization should select Verizon phone service, or purchase a competitor's products rather than Verizon's. Participation in outside civic or charitable activities should not interfere with your work for Verizon. To the extent your participation infringes on company time or involves the use of Verizon resources, your supervisor's approval is required.

**I have been asked to participate in an investor expert network as a tech industry professional. This expert network does research to assist investors. If I do not reveal any confidential Verizon information, can I participate?**
Employees and executives are generally prohibited from participating in expert networks for investors due to insider trading concerns. You should consult with Verizon Ethics regarding this request.

Service in an outside organization on behalf of Verizon means that you are expected to represent Verizon's interests when participating in the organization's activities. Prior to serving as a representative of Verizon with any outside organization, you must obtain the prior approval of Verizon Ethics and your vice president level supervisor.

Special approval requirements apply when seeking to serve on any outside company's Board of Directors:

- Service on the Board of Directors of a public corporation must be approved in advance by both Verizon Ethics and your organization's executive vice president.
- Service on the Board of Directors of a non-public corporation must be approved in advance by Verizon Ethics.

Cellco_Hitch002330
Class Cert. 124

# EXHIBIT F

Class Cert. 125

# Integrity is at the core of who we are.

## Code of Conduct



**November 2024**

Cellco_Hitch000002
Class Cert. 126

Cellco_Hitch000002

# A letter from Hans

---

## Hello V Team,

Trust and transparency are the bedrock of any business. At Verizon, we conduct our work at the highest level of operational excellence with integrity and accountability as core values baked into the very fabric of our culture and Credo.

Guiding our operations, processes and behaviors is a Code of Conduct that reinforces how we must manage our relationships and business. It provides a framework to gauge when we need to seek guidance on ethical dilemmas and what to do when faced with compliance concerns. Most of all, it's a moral compass that lifts up our Purpose so that we can continue to move the world forward.

Everyone has a role to play in making sure we hold ourselves to the highest ethical standards and integrity in our work. At times, that may mean making some tough decisions, but to remain at the forefront of the industry means we lead by example with our values guiding us forward.

Please review our Code of Conduct and seek guidance if you have any questions or concerns. Being part of the V Team means we have the honor of serving our customers and communities who trust us and are counting on us to do right by them. It's important to not only understand our values but put them into practice by living them every day.

Together, we will continue to grow and elevate our standards to make our company even greater than it is today. And we will do it the right way — the V Team way.

#ForwardTogether

Hans



Cellco_Hitch000004
Class Cert. 127

Cellco_Hitch000004

# Introduction[1]

**My manager is directing me to violate the expense policy. I am concerned that she will retaliate against me if I report her. What do I do?**
You should report the manager's misconduct. Retaliation against employees who report concerns is strictly prohibited, and if you have concerns about retaliation, you must report those as well. In addition, you have the option of making an anonymous report to Verizon Ethics.

We are defined by our values: integrity, respect, performance excellence, accountability, and social responsibility. These values should guide us in how we deal with every problem at work, large and small. The Code of Conduct gives us detailed guidance about how to apply Verizon's values to specific issues and challenges that arise in our jobs. It reflects our changing business environment and has been approved by the Verizon Board of Directors.

You must follow the law, the Code of Conduct, and all Verizon policies and guidelines. You can't violate any of these rules for any reason, even if you are instructed to do so by a supervisor. Violations of this Code, or any other Verizon policy, can lead to discipline up to and including termination of employment.

But following the Code of Conduct is just a starting point. We're all expected to help maintain and promote the culture of integrity that is one of Verizon's greatest competitive advantages. A critical part of maintaining a culture of integrity is making sure that each of us asks questions and raises concerns. If you do this, you can help the company spot issues before they turn into problems. Reporting misconduct or ethics concerns isn't just an option – it's each employee's responsibility. You must report suspected misconduct and violations of the Code. Supervisors and managers who have knowledge of conduct that violates Company policy and fail to report the conduct, take the proper corrective action, or who otherwise condone such conduct, will themselves be subject to corrective action up to and including termination of employment.

Employees in supervisory roles have a special duty to set the right example. Supervisors and managers must promote an open-door culture in which employees are comfortable speaking their mind.

If your local laws conflict with the Code of Conduct or your business unit has more restrictive policies or practices, you must comply with the local law or the unit's policy or practice.

## Retaliation

Verizon will not tolerate retaliation against any employee who reports misconduct, cooperates with an investigation or engages in other related protected activity. Retaliation is any action that seeks to discourage an individual from making or supporting a complaint, or that punishes those who have come forward with such complaints. In addition to being prohibited by Verizon policy, such retaliation also may be unlawful.  For additional examples of prohibited retaliation, please see Verizon's Anti-Harassment and Anti-Discrimination Policy.

An employee who engages in retaliation in violation of Verizon's anti-retaliation policy, or interferes with or refuses to cooperate in a company or government investigation, will be subject to disciplinary action, up to and including termination of employment.

Cellco_Hitch000007

Class Cert. 128

Cellco_Hitch000007

Case 2:25-cv-01469-TL   Document 43   Filed 06/30/26   Page 141 of 169

An employee who feels they are being retaliated against for raising or supporting a complaint or engaging in other protected activities should report their concerns immediately to Verizon Ethics.

---

## Where to report

**I work in a store, and a police officer came into the store to demand records about a customer. What should I do?**
You should refer any requests from law enforcement to Security or the Legal Department immediately. Additional information about the handling of external requests is available on page 23 and contact information for Security and the Legal Department is available at the end of the Code of Conduct.

You have an array of resources to assist you should you have any concerns or questions about how the Code applies to a particular issue. Verizon Ethics is available 24 hours a day, 7 days a week at 844-894-8433 (US), verizonethics.com, or ethics@verizon.com. You can make anonymous reports to Verizon Ethics, and you can contact Verizon Ethics either to report misconduct or just to ask a question about the Code of Conduct or company policy. A complete list of available resources is available at the end of the Code of Conduct.

You must immediately report any instance of violence, hostile behavior, or possession of weapons on company property to Security and a supervisor. In cases of imminent danger, you should contact 911 or local law enforcement first, and then contact Security at 800-997-3287 (US) or 972-615-4343 (International).

You must report any concerns or questions you have about the accuracy or integrity of Verizon's financial statements, reporting, accounting, internal accounting controls, or auditing matters to Verizon Ethics.

---

## Cooperation with investigations

You must cooperate completely in any investigation. You must be honest and forthcoming at all times during an investigation, and you must provide any investigator with full, accurate, timely, and truthful information. Misrepresenting facts or failing to disclose facts during an investigation is strictly prohibited. You can't interfere with or obstruct an investigation conducted by the company or by any government agency.

[1]You are required to comply with this Code as a condition of continued employment. This Code may be changed by the company at any time, except pursuant to any applicable collective bargaining obligations, without notice to you. Except where applicable law provides otherwise, employment with Verizon is "at will," which means that you or Verizon may terminate your employment, at any time, with or without cause, with or without notice, for any reason not prohibited by law, unless governed by a collective bargaining agreement or specific contract of employment. Any at will employment relationship may not be modified except in a written agreement signed by an authorized Verizon officer.

Cellco_Hitch000008

Class Cert. 129

Cellco_Hitch000008

# Integrity and fairness in the workplace.

Our company's reputation is based on the actions of its employees. Each of us must act with integrity and respect at all times.

## Conflicts of interest

You must avoid any relationships or activity that might impair, or even appear to impair, your ability to make objective and fair decisions when performing your job. When acting on behalf of the company, you must advance the company's legitimate interests when the opportunity to do so arises. If you identify a situation where the company's interests are being harmed, you must report the matter to Verizon Ethics.

You must never use Verizon property or information for personal gain or take personal advantage of any opportunity that arises in your work for Verizon.

You must disclose any potential or actual conflict to Verizon Ethics as soon as you become aware of it.

## Personal conflicts of interest

Certain types of personal relationships can create actual or apparent conflicts of interest both internally at Verizon and in our interactions with third parties. Never use your position at the company to improperly advance your personal interests or those of a friend or relative.

Internally, you may not supervise – directly or indirectly – someone with whom you share a close personal relationship, such as anyone in your family or household, or someone with whom you have or had a romantic relationship or other similar relationship. Even if a family member or romantic partner is not in your reporting chain, if you interact with such a person as part of your Verizon work responsibilities, you must avoid any actions at work that could create even the appearance of a conflict of interest. If you are uncertain about what interactions are appropriate, you must contact Verizon Ethics.

Externally, you may not participate in the selection process for, have discretionary authority involving Verizon's business with, or supervise Verizon's relationship with, a company that does business with Verizon if it employs someone with whom you have a close personal relationship or is a company with which you have a business relationship. Exceptions to this restriction are extremely limited and require the approval of Verizon Ethics.

---

**I am a Vice President and one of my reports disclosed a personal conflict of interest to me. I promptly implemented controls to minimize the risk. Is that sufficient?**
No. All conflicts and potential conflicts of interest must be cleared by Verizon Ethics.

---

**I work with several vendors and wanted to introduce them to my college-age daughter, who is looking for a summer internship. She's very qualified, and would be a tremendous asset to any of the vendors. Can I ask the vendors to meet with her about an internship?**
If you work with a vendor, asking that vendor for personal favors is generally prohibited. Here, it is not okay to ask the vendor to consider one of your relatives for a position, even a summer internship. The request could create the appearance of favoritism and place inappropriate pressure on the vendor.

Cellco_Hitch000016

Class Cert. 130

If a family member or person with whom you have a close personal relationship is employed by an entity that does business with Verizon, you cannot interact with that individual about business between Verizon and the outside entity.

## Outside employment

You may not – with or without compensation – be self-employed or employed by, consult with, own, perform services for, or aid:

- a company or organization (including a charitable organization) that is a vendor, supplier, partner, contractor, subcontractor, or competitor of Verizon; or
- a company that provides services that are provided by Verizon, or that Verizon is seeking to provide.

Outside work must not interfere with your work for Verizon or have any connection to the company (for example, soliciting coworkers for business or investments). This limitation also applies to simultaneous employment by Verizon and its subsidiaries, affiliates, and joint ventures in which the company maintains an ownership interest. Exceptions to the requirements of the previous paragraph may be granted only upon written approval by Verizon Ethics.

Unless you receive the prior written approval of your supervisor and Human Resources, you may not engage in any outside employment or self-employment or perform any commercially-related services – with or without compensation – while absent from work on any company-approved leave of absence, absence due to sickness or disability, Family Medical Leave, or comparable leave provided for by applicable law.

## Outside activities

When employees participate in outside activities, Verizon draws a distinction between personal activities (not representing Verizon) and service on behalf of the company (representing Verizon). Many employees, in their personal capacities, participate in outside civic and charitable activities by serving as trustees or members of various community organizations such as local not-for-profits, religious institutions, parent teacher associations, or homeowners' associations. If a matter regarding Verizon's services or products arises when performing such outside civic or charitable activities, you must remove yourself from discussing or voting on the matter or on any matter that involves the interests of Verizon or its competitors to avoid conflicts of interest, such as whether your organization should select Verizon phone service, or purchase a competitor's products rather than Verizon's. Participation in outside civic or charitable activities should not interfere with your work for Verizon. To the extent your participation infringes on company time or involves the use of Verizon resources, your supervisor's approval is required.

Service in an outside organization on behalf of Verizon means that you are expected to represent Verizon's interests when participating in the organization's activities. Prior to serving as a representative of Verizon with any outside organization, you must obtain the prior approval of Verizon Ethics and your vice president level supervisor.

Special approval requirements apply when seeking to serve on any outside company's Board of Directors:

- Service on the Board of Directors of a public corporation must be approved in advance by both Verizon Ethics and your organization's executive vice president.
- Service on the Board of Directors of a non-public corporation must be approved in advance by Verizon Ethics.

**How do I find out if the company where I have a second job is providing services that are also provided by Verizon?**
Verizon provides a wide array of products and services. Many are obvious, including telephone, internet, and television service. However, Verizon provides many other services, and if you think there is any chance that an outside employer might be operating in the same space as Verizon, you must contact Verizon Ethics for guidance.

**My supervisor knows that I have a side job designing apps for mobile devices. Do I have to let anyone else know?**
A "side hustle" related to the field in which you work for Verizon, or involving any product or service in which Verizon might be active, must be approved by Verizon Ethics.

**I have been asked to participate in an investor expert network as a tech industry professional. This expert network does research to assist investors. If I do not reveal any confidential Verizon information, can I participate?**
Employees and executives are generally prohibited from participating in expert networks for investors due to insider trading concerns. You should consult with Verizon Ethics regarding this request.

Cellco_Hitch000017
Class Cert. 131

# EXHIBIT G

Class Cert. 132

**Inside Verizon**

Home    Our Culture    For Me    Work Tools    V Team Central    Departments

Search

❮ **Show Menu**

## Standards of Conduct

Inside Verizon  /  HR Guidelines  /  LifeAndTimeOff  /  WorkplaceEnvironment  /  Standards of Conduct

❮ **Show Menu**



### Conduct Violations

Types of behavior and conduct violations that may result in immediate corrective action, up to and including termination of employment, include but are not limited to:

- Alcohol or drug use, possession or distribution on the job, while using a company vehicle, or while acting on behalf of the company

- Possession or use of firearms, other weapons or explosives on company premises, in company vehicles or while involved in company business

- Illegal, violent, abusive or threatening activities including gambling or instigating, provoking or being a participant in a fight or threatening bodily injury on company premises or while involved in company activities

- Falsification of or omitting pertinent information on any company, government or regulatory document or record

- Failing to safeguard,theft or attempted theft of funds, property or intangible assets belonging to the company, co-workers, or customers

- Insubordination including failure to carry out a direct order or encouraging a slowdown or interruption of work

- Failing to cooperate fully in company investigations or drug/alcohol tests

- Disregard of safety or security guidelines and requirements

- Failure to maintain the confidentiality of Verizon  employee, customer or client information

- Improper use of company electronic communication or computerized systems

- Violation of the Verizon Code of Conduct

- Engaging in unlawful discrimination, the creation of a hostile work environment, sexual harassment and unlawful harassment of any kind

- Engaging in conduct which causes embarrassment to the company or potentially disparages its image

Chat with us

CONFIDENTIAL

Cellco_Hitch002350
Class Cert. 133

- Unethical conduct including the solicitation or acceptance of gratuities from vendors, customers or clients or
- Conflicts of interest.

## Corrective Action

Termination of employment is very often warranted for conduct violations.

Corrective action for conduct violations, however, can be based on many factors and may range from counseling to immediate termination of employment. Progressive corrective action steps are generally not applied to conduct violations because of the serious nature of such violations and because further incidents will not be tolerated.

## No Retaliation

Verizon will not tolerate retaliation against any employee who reports conduct violations or participates in the investigation of a conduct violation.

An individual who feels he/she is being retaliated against should immediately bring his/her concerns to:

- his/her immediate supervisor
- local Human Resources or
- Verizon Ethics at www.verizonethics.com, ethics@verizon.com, #ethics on Slack, or 844-894-8433 (U.S.)

An employee who retaliates against any other employee for reporting a conduct violation, or interferes with or refuses to cooperate in an investigation may face disciplinary action, as the company deems appropriate, up to and including termination of employment.

For International dialing instructions, go to http://www.verizon.com/about/vzguide/international.

## Responsibilities

An employee is responsible for acting with fundamental honesty and integrity in all of his/her company dealings, complying with all laws that govern our business, maintaining an ethical and professional work environment, and complying with Verizon's Code of Conduct and all company policies. He/She must also refrain from behaviors that might be harmful to himself/herself, coworkers or Verizon.

A supervisor is responsible for monitoring job performance to ensure that the standards of conduct are being maintained. A supervisor or manager who becomes aware of situations involving violations of conduct is responsible for taking immediate action that includes contacting Human Resources, or other appropriate company resources.

**Cooperation with Company Investigations**

All employees are required to cooperate fully during company investigations.  Cooperation means that employees will:

- Be honest and forthcoming regarding all factual matters relating to the investigation;
- Refrain from interfering with or obstructing any investigation, including maintaining strict confidentiality regarding all aspects of the investigation, preserving all relevant evidence, and refraining from any coercion, persuasion or intimidation of potential witnesses; and
- Not retaliate against anyone for their actual or perceived participation in an investigation.

 ### References

For more information, refer to:

- Drug and Alcohol
- Harassment and Discrimination
- Verizon Code of Conduct
- Workplace Violence

 Chat with us

Cellco_Hitch002351
Class Cert. 134

Help

Proprietary and Confidential. Not for disclosure outside of Verizon. | Full Legal Disclaimer | Browser Policy          © 2024 Verizon

 Chat with us

Cellco_Hitch002352
Class Cert. 135

# EXHIBIT H

Class Cert. 136

█████ - Code of Conduct: Integrity Always Matters [Management (Non-Union)]



## 3.5 Outside employment key points



Verizon confidential and proprietary. Unauthorized disclosure, reproduction or other use prohibited.

█████ - Code of Conduct: Integrity Always Matters [Management (Non-Union)]





Verizon confidential and proprietary. Unauthorized disclosure, reproduction or other use prohibited.

CONFIDENTIAL

Cellco_Hitch002512
Class Cert. 138

███████ - Code of Conduct: Integrity Always Matters [Management (Non-Union)]





Verizon confidential and proprietary. Unauthorized disclosure, reproduction or other use prohibited.

CONFIDENTIAL

Cellco_Hitch002513

Class Cert. 139

 - Code of Conduct: Integrity Always Matters [Management (Non-Union)]

### 3.7 Personal Conflicts key points



## Himari's good deeds.

This is a good rule to follow in general: Think carefully and contact Verizon Ethics if your outside work could have anything to do with Verizon or any of its offerings.

Verizon does not allow employees to have side gigs that compete with products or services offered by Verizon – whether the work is paid or unpaid. And while a particular job may not appear to compete with Verizon, the company is engaged in a variety of markets including finance and healthcare, so it's best to check with us before taking any outside job. Verizon Ethics will help you work through whether your activities conflict with something Verizon does or is planning to do.

Transcript

We get it, it isn't easy to thread this needle. Don't hesitate to reach out to us – we're happy to work through it with you. We consider it time well spent.



Verizon confidential and proprietary. Unauthorized disclosure, reproduction or other use prohibited.

CONFIDENTIAL

Cellco_Hitch002516

# EXHIBIT I



### 3.4 Focus Key Points



How are you feeling? You're over halfway through.

Before we move on to our last section, here's something to remember.

As V Teamers, we focus on what's best for Verizon and our customers. That means that we avoid conflicts of interest and we sell with integrity.

We never:

- Hire or supervise close friends or family members.

Verizon confidential and proprietary. Unauthorized disclosure, reproduction or other use prohibited.

Cellco_Hitch002918
Class Cert. 142

- Do work for Verizon's competitors while employed by Verizon.
- Trade securities based on confidential information we know as a result of our jobs.
- Solicit colleagues or vendors to support our personal charities.



Verizon confidential and proprietary. Unauthorized disclosure, reproduction or other use prohibited.

Cellco_Hitch002919
Class Cert. 143

# EXHIBIT J



## *3.4 Outside employment and activities*



Verizon confidential and proprietary. Unauthorized disclosure, reproduction or other use prohibited.

CONFIDENTIAL

Cellco_Hitch003109
Class Cert. 145

## Item 1 (Slide Layer)



## Item 2 (Slide Layer)



Verizon confidential and proprietary. Unauthorized disclosure, reproduction or other use prohibited.

CONFIDENTIAL

Cellco_Hitch003110
Class Cert. 146

# EXHIBIT K

 Code of Conduct 2021 – Integrity always matter                    Associate v1.01



### *3.4 Outside employment and activities*



Verizon confidential and proprietary. Unauthorized disclosure, reproduction or other use prohibited.

CONFIDENTIAL

Cellco_Hitch003249
Class Cert. 148

█████ Code of Conduct 2021 – Integrity always matter                    Associate v1.01

**Item 1 (Slide Layer)**



**Item 2 (Slide Layer)**



Verizon confidential and proprietary. Unauthorized disclosure, reproduction or other use prohibited.

CONFIDENTIAL

Cellco_Hitch003250
Class Cert. 149

# EXHIBIT L

### *7.7 second job 2 TF*

*(Pick One, 10 points, 1 attempt permitted)*



| Correct | Choice |
| --- | --- |
| X | No, he cannot work for a competitor. |
| | Yes, this is fine. The work he's doing is unrelated to his Verizon job. |



Verizon confidential and proprietary.
Unauthorized disclosure, reproduction or
other use prohibited

02.16.2022    page | **130**

Cellco_Hitch003492
Class Cert. 151

**Correct (Slide Layer)**



**Incorrect (Slide Layer)**





Verizon confidential and proprietary.
Unauthorized disclosure, reproduction or
other use prohibited

02.16.2022          page | **131**

CONFIDENTIAL

Cellco_Hitch003493
Class Cert. 152

### 7.8 free consulting services TF

*(Pick One, 10 points, 1 attempt permitted)*



| Correct | Choice |
|---------|--------|
| X | No |
|  | Yes |



Verizon confidential and proprietary.
Unauthorized disclosure, reproduction or
other use prohibited

02.16.2022
TPM P-74299.1

page | **132**

CONFIDENTIAL

Cellco_Hitch003494
Class Cert. 153

**Correct (Slide Layer)**



**Incorrect (Slide Layer)**





Verizon confidential and proprietary.
Unauthorized disclosure, reproduction or
other use prohibited

02.16.2022          page | **133**

CONFIDENTIAL

Cellco_Hitch003495
Class Cert. 154

# EXHIBIT M

Class Cert. 155

███ Code of Conduct 2021 – Integrity always matter                                              ███

███████████████████

███████████████████



| Correct | Choice |
|---------|--------|
| X       | I acknowledge. |

Verizon confidential and proprietary. Unauthorized disclosure, reproduction or other use prohibited.

CONFIDENTIAL

Cellco_Hitch003221
Class Cert. 156

Code of Conduct: Integrity Always Matters [Management (Non-Union)]



### *7.2 Management Attestation*



Verizon confidential and proprietary. Unauthorized disclosure, reproduction or other use prohibited.

CONFIDENTIAL

Cellco_Hitch002602

Class Cert. 157